## THE STATE v. RICHARD ESTES and BUCK JOHNSON, Appellants.

### Division Two, February 18, 1908.

1. **THEFT: Circumstantial Evidence: Sufficiency.** The evidence in this case is reviewed and held sufficient to support the verdict finding defendants guilty of having stolen chickens in the night time.

2. ———: ———: **Conflict.** It is for the jury to settle the conflict between the evidence of defendants and that of the prosecuting witness; and if they believe the latter, and disbelieve the former, all conflict disappears.

3. ————: **Falsehood: Usual Concomitant.** It is a familiar experience that falsehood is the usual concomitant of crime, whereas truth is the reliance of innocence.

4. **NEW TRIAL: Newly-Discovered Evidence.** Where it is obvious that the newly-discovered evidence would be only cumulative, and would at most only have the effect of impeaching a State's witness, whose testimony defendants had themselves contradicted, the court does not commit error in refusing to grant a new trial.

Appeal from Boone Circuit Court.—*Hon. E. W. Hinton,* Special Judge.

AFFIRMED.

*Gillespy & Conley* for appellants.

(1)  Where evidence is circumstantial the facts and circumstances in evidence should be consistent with each other and with the guilt of defendants, and inconsistent with any reasonable theory of defendants' innocence. State v. Francis, 199 Mo. 671; State v. Gordon, 199 Mo. 561; State v. Crabtree, 170 Mo. 642. Circumstantial evidence to be sufficient must be of such a character as to leave the inference of guilt the only reasonable inference to be deduced from the facts disclosed by the evidence. State v. Francis, 199 Mo. 671. Mere suspicion, however strong, will not supply the place of evidence where life or liberty is at stake. State v. Scott, 177 Mo. 665; State v. Morney, 196 Mo. 43; State v. Crabtree, 170 Mo. 642; State v. Ballard, 104 Mo. 634; State v. Jones, 106 Mo. 302; State v. Gordon, supra; State v. King, 174 Mo. 662. It is a fundamental principle of law that each independent fact must be proved in the same satisfactory manner as if the whole issue rested upon the proof of that fact. State v. Crabtree, 170 Mo. 642. Proof of the *corpus delicti* involves two things: First, a criminal act; second, the defendant's agency in the production of the act. State

v. Knolle, 90 Mo. App. 238; State v. Dickson, 78 Mo. 447; State v. Jones, 106 Mo. 312; 3 Greenl. Ev., sec. 30; Whart. Crim. Ev., sec. 325; State v. Kingsland, 174 Mo. 662. (2) Where newly-discovered evidence is relevant and important, and it is shown that it was not discovered before the trial, the refusal of a new trial is error. State v. Morgan, 96 Mo. App. 343; State v. Curtis, 77 Mo. 267; State v. Speritus, 191 Mo. 24. It makes no difference that such newly-discovered testimony would also have the effect of impeaching the State's witness. State v. Murray, 91 Mo. 103. Testimony which would contradict the testimony of a witness to a material fact, newly-discovered, is sufficient grounds for a new trial. Standard Investment Co. v. Hoyt, 164 Mo. 140; State v. Murray, 91 Mo. 95; State v. Bailey, 94 Mo. 315; Keenan v. People, 104 Ill. 385; Casey v. State, 20 Neb. 138. If the evidence would have a tendency to shape the verdict of the jury in a new trial, the motion should prevail. State v. Murray, 91 Mo. 104; State v. Bailey, 94 Mo. 316.

*Herbert S. Hadley*, Attorney-General, and *N. T. Gentry*, Assistant Attorney-General, for the State.

(1) The trial court properly declined to grant defendants a new trial on the ground of newly-discovered evidence. In order to justify the trial court in granting a new trial on the ground of newly-discovered evidence, the evidence must not be cumulative; and it must not simply tend to impeach a witness for the State. State v. Butler, 67 Mo. 63; State v. Lucas, 147 Mo. 72; State v. Ray, 53 Mo. 345; Graham & Waterman on New Trials, secs. 488 and 496; Bishop on Criminal Procedure, sec. 1279. Again, the motion for a new trial is not accompanied by the affidavit of the defendants' attorneys, Messrs. Gillespy & Conley, who represented him in the trial court and who represent him in this court,

to the effect that they did not know of said newly-dis-
covered evidence.   In a recent and well-considered case,
this court held that the affidavit of both the defendant
and his attorney was necessary in order to entitle the
defendant to a new trial, for this reason.    State v.
Hunt, 141 Mo. 637; State v. Howard, 118 Mo. 127; State
v. Burns, 85 Mo. 47; State v. Phillips, 117 Mo. 394.   On
writing on the subject of knowledge of the defendant's
counsel, Judge Thompson said, "Knowledge of counsel
of such matters is knowledge of the client."   2 Thomp-
son on Trials, sec. 2725; Parker v. State, 55 Miss. 414;
Russell v. Quinn, 114 Mass. 103; State v. King, 194 Mo.
84.   (2)   The evidence in the case at bar was clear and
convincing.    It cannot be argued that there was no
proof of the *corpus delicti,* as defendant Estes admit-
ted to the prosecuting witness that he knew who stole
the chickens and when they were stolen.   Hinshaw v.
State, 147 Ind. 362; Walker v. State, 49 Ala. 400; Peo-
ple v. Arnold, 43 Mich. 305; 4 Elliott on Evidence, sec.
2723; State v. Benner, 64 Me. 289; State v. Dickson, 78
Mo. 448; State v. Ferguson, 162 Mo. 678; State v.
Grubb, 201 Mo. 608; Wills on Circ. Ev., pp. 80 and 81.

GANTT, J.—At the June term, 1906, of the circuit
court of Boone county, the grand jury returned an in-
dictment against the defendants, charging them with
stealing fifty chickens of the value of twenty-five dol-
lars, on the night of April 28th, 1906, the property of
one Henry Baumgartner, from the messuage of the said
Henry Baumgartner.   At the October term, 1906, the
defendants were tried and convicted and the punish-
ment of each assessed at a fine of twenty-five dollars.
After ineffectual motions for a new trial and in arrest
of judgment, the defendants have appealed to this
court.

The evidence on the part of the State tended to
prove that Henry Baumgartner, the prosecuting wit-

ness, was a farmer and living three miles east of Columbia in Boone county, and the defendants Estes and Johnson lived with each other about two and a half miles east of Baumgartner's. Within a half mile of where Estes and Johnson lived there was a country store, owned by Mr. Finley, in which the postoffice was kept, which was known as Harg. At that time Finley was buying poultry and shipping it to Columbia. About seven miles from the home of the defendants, the town of Millersburg in Callaway county was situated on the road from Columbia to Fulton. On Sunday the 29th of April, 1906, Baumgartner's wife went to her hen house situated within a messuage, about the usual time in the afternoon, and found no eggs, although she had been in the habit of getting about forty eggs every day. Early Monday morning Baumgartner and wife again went to the chicken house, where the chickens roosted, and found only thirty-five or forty chickens left and fifty or sixty of their chickens gone. The stolen chickens were Barred Plymouth Rocks, one hen lighter in color and larger than the others, and had a dark streak around her neck. The chickens so missed were worth about twenty-five or thirty dollars. About two weeks after the disappearance of his chickens Baumgartner met the defendant, Richard Estes, on the street in Columbia, and defendant Estes asked Baumgartner if he had heard the story that was going around about defendant stealing the chickens. Baumgartner admitted that he had; thereupon Estes said he had not done anything of the kind and wanted the talk stopped. Later on that same day defendant Estes came to see Baumgartner again, and inquired when he missed the chickens and said that he, Estes, knew when they were taken; that they were taken on the 28th of April, and sold on the 5th of May, and then correctly described the stolen chickens. He said further, "I know all about it, but I did not get your chickens. I told Buck Johnson

on the way to Millersburg, 'As soon as Henry Baumgartner finds out that we sold chickens in Millersburg, he will be on you.' " ' Estes said that the chickens that he sold were nice Barred Plymouth Rock hens, except the light hen with the streak around her neck. He further said that he was paying defendant Johnson $14 per month, and had agreed to pay him in chickens. On the same day Baumgartner met defendant Johnson on the street, and he also began a conversation in regard to the chickens, and inquired if Baumgartner had heard that Gillespy was telling it down at Millersburg that they stole Baumgartner's chickens, and he told him he had. Defendant Johnson then told Baumgartner that Estes would be in and see him that evening, and not to do anything until Estes came. He further said that his mother tried to get him not to go down to work for Estes, fearing he would get into trouble, and he did not want his father and mother to know anything about this. In conclusion he said, "We will make it all right with you if we can; you will wait on us, will you?"

On Saturday, the 5th of May, 1906, these two defendants drove a wagon from their residence, some seven miles, to Millersburg, and stopped at the store of Waters & Coons in that village, reaching there about sun-up, and a clerk named Selby came out to see what they wanted, and the defendant Johnson asked if the firm would buy any chickens; when told that they would, defendant sold him between forty and fifty Barred Plymouth Rock chickens at eight cents per pound. Three of the chickens were darker than the rest and one of the hens had a streak around her neck. Defendant Johnson said they were going to Fulton to take these chickens to his mother, but as it was raining, he did not want to go in the mud. A check was written out in payment of the chickens and given to Johnson. After the clerk Selby had left the store, defendant Estes bought a nickel's worth of tobacco from Mr. Coons,

one of the firm, and cashed this check in payment for the same. Johnson stated that he would give this money to his mother, and then he and Estes drove back in the direction of their home in Boone county. These chickens were sold by Waters & Coons and shipped away before they had heard of the larceny. Fulton is about twelve miles east of Millersburg.

The defendant Johnson had a conversation with C. C. Gillespy, in which he said he did not want Gillespy to say anything more about this chicken business; whereupon Gillespy said it was public talk in Millersburg; whereupon Johnson said, he bet a dollar with Estes that it would not make any trouble if they took these chickens to Millersburg and that Estes won the bet. This conversation was on the Saturday that the two defendants were arrested.

On the part of the defendants the evidence tended to show that they had purchased a mixed lot of chickens about the 2nd or 3rd of March, when they moved to the farm where they were living, some of which were Plymouth Rocks, from one James Finley, who had previously lived on the farm to which they moved. Matt Turner, an uncle of the defendant Estes, testified there were thirty-five chickens in the lot purchased by Estes of Finley. William Mitchell also testified that he sold defendant Estes two dozen Buff Plymouth Rocks the spring that he moved onto the place, and William Johnson testified that he sold him a dozen Barred Plymouth Rock hens. This witness was a brother of the defendant Buck Johnson. The father of the defendant Estes testified that the mother and sister of the defendant Estes let him have five dozen Plymouth Rocks to take with them when they moved to the Turner place in the spring of 1906. Defendant Estes further introduced evidence tending to show that he was at the Harg post-office until eleven o'clock the Saturday night on which the chickens were stolen. Both defendants testified

they were at Harg until eleven o'clock that night, when they went home, and did not steal the chickens in question. A week after that they started to Fulton driving a wagon and taking a lot of chickens to sell. At Millersburg they sold fifty-two chickens to Waters & Coons for $21.58, and Estes bought a nickel's worth of tobacco and cashed the check. They were going to Fulton to attend the stock sales, although they admitted that the stock sales would not begin until the Monday following. When they reached Millersburg they concluded to go no further on account of the rain, and so sold the chickens to Waters & Coons and returned home. They admitted it began to rain on them one mile west of Millersburg, and that they had never before been to Fulton to attend stock sales.

Reese Estes, the brother of Richard, testified that he stayed all night the night of April 28th, 1906, with the defendants at their home; they were at the store at Harg until eleven o'clock, and then went to their place; he slept in an adjoining room to them, the door was open between the two rooms and they went to bed about the same time, he talked to them after he had laid down; he found them there the next morning about 8 o'clock when he got up.

Defendant Richard Estes testified that when he went to take charge of the Turner farm in March, 1906, he took about 135 or 140 chickens that he had gotten from different people, some from Mr. Mitchell and some from Mr. Perkins, Johnson and Finley. He had sixty Barred Plymouth Rocks and thirty-five Plymouth Rocks and Leghorns from Finley. He got one dozen Wyandottes from Perkins, and he had hired Johnson to work with him on the farm; he had not paid him on the first of May and he told him to get as many chickens as he wanted; he paid him for his month's work in chickens; he was to pay him $14 per month. Johnson said he wanted to go to Fulton, and when they got as

far as Millersburg I said, "Sell the chickens there, I do not want to drive the mules any farther." It was raining and his team was not shod and the roads were rough. Previous to this trip, he had sold some chickens to Martin and to Berry, could not remember selling to anybody else. After they sold this lot at Millersburg, he thought there were about one hundred left. They started that morning to Millersburg about seven o'clock, got there about eight and Mr. Selby was at the store; neither he nor defendant Johnson had any money except what they got for the chickens.

Defendant Johnson corroborated Estes as to the trip to Fulton and what occurred at Millersburg. As to the conversation with Baumgartner, he stated that he told him that he had heard some talk that they had stolen the chickens, and he did not think it was right, for his mother would think he was stealing chickens for a living. He spoke to him because he heard he was telling this story and he wanted him to stop talking it. On cross-examination, he stated they did not sell any chickens to Finley at Harg. He stated that he had never been to one of the stock sales at Fulton. The reason they started to Fulton on Saturday to be there on Monday was that he thought by the time the sales commenced, he could go over the town, he wanted to see it. He was to pay Estes's expenses for going with him. He denied the conversation with Baumgartner as to his requesting the latter to wait to see Estes before he took any steps.

Richard Estes, Sr., testified that Baumgartner told him the chickens were taken away in a two-horse wagon; that they saw the tracks near the house where the team was hitched.

In rebuttal the State offered C. W. Martin and L. W. Berry and M. V. O'Rear, who was a clerk for Mr. Martin, who testified, that that firm bought of R. J. Estes in the latter part of the winter and spring of

1906 chickens as follows: ''Feb. 17th, 21 chickens; Feby. 28th, 21 chickens; March 16th, 35 hens; April 21st, 31 hens.'' The checks were made out in the name of R. J. Estes. Finley testified that he bought from Richard Estes during the month of March, April and the first part of May, thirteen chickens. Tom Winiger testified that he knew the defendants and on the night the chickens were stolen, he was at Harg and went home with the defendant and Richard Estes, that is, to the point where he turned off, and then he went home by himself. On the next day he saw Richard Estes in his pasture in the morning; the defendant Estes was sitting on his horse and there were four persons present, Carl Frazier, Sisson, Geo. Winiger and the witness; the defendant gaped and I said: ''You look sleepy,'' and he said, ''Yes, Buck and me went to Dick Johnson's after we came from the store.'' Dick Johnson lived some four miles from there southeast.

In surrebuttal the defendants offered Reese Estes as a witness, and he testified that his name was Reese James Estes, and that he had sold chickens to Martin and to Berry, and that his brother, the defendant's, initials were R. B., and that he had sold chickens to Martin and to Berry and received the check payable to himself; did not remember how many checks he took; would not say that his brother did not sell Mr. Martin or Mr. O'Rear any chickens in March or April. He could not remember the amount of any check he had gotten for chickens that he had sold to Martin and to Berry. Richard Estes, Sr., testified that his wife raised a great many chickens and sold chickens and eggs every week, sent them to town sometimes by Reese Estes and sometimes the girls would bring eggs. The defendant Richard Estes recalled testified that he was not the man that delivered the chickens to Mr. O'Rear and Martin and received the check, did not think he ever took any chickens to Martin and O'Rear. He stated that he had

sold Martin some chickens, that is, he bought the chickens, and Reese, his brother, got the checks. As to the conversation with Winiger he stated he did not see Winiger at the time mentioned; denied that he gaped, and said he was not close to him, as he was fishing on the side of the creek; he had heard that Winiger was going to say that he yawned. This was substantially all the evidence in the case.

I.    This prosecution is bottomed on the Act of March 18th, 1903, which makes it a felony to steal any domestic fowl or fowls in the night-time from the messuage of another or from the premises upon which the dwelling house of another is situate. [Laws 1903, p. 161.] The instructions of the court are not challenged save and except the refusal of the court to direct a verdict of acquittal at the close of the evidence. The defendants rely upon three grounds for a reversal of the judgment. The first two grounds are in effect the same, to-wit, that there is no substantial evidence to support the verdict, and the third ground is that the court erred in refusing to grant a new trial on the ground of newly-discovered evidence. The evidence upon which the defendants were convicted was circumstantial and the court instructed the jury that the State depended upon circumstantial evidence to establish the crime and to identify the defendants as the ones who were guilty. "And in such case, you are instructed that all the facts and circumstances relied upon by the State as establishing the perpetration of the crime and the identity of the defendants as the ones who perpetrated it, must be consistent with each other and with no other rational conclusion than that a crime was in fact committed, and that the defendants are the persons who committed it. To warrant a conviction on circumstantial evidence, each fact necessary to the conclusion sought to be established must be proved by competent evidence beyond a reasonable doubt, and all the facts necessary to such

conclusion must be consistent with the main fact sought
to be proved; and the circumstances taken    together
must be of conclusive nature, leading on the whole to
a satisfactory conclusion and producing a reasonable
and moral certainty that the accused and no other per-
son committed the offense charged.    The mere union
of a limited number of independent circumstances,
each of an imperfect and inconclusive character, will
not justify a conviction.    They must be such as to
generate and to justify full belief according to the
standard rule of moral certainty.    It is not sufficient
that they coincide with and render probable the guilt
of the accused, but they must exclude every other rea-
sonable hypothesis.    No other conclusion but that of
the guilt of the accused must fairly and reasonably
grow out of the evidence, and the facts must be abso-
lutely incompatible with innocence, and incapable of ex-
planation upon any other reasonable hypothesis than
that of guilt.''    It is earnestly insisted by the defend-
ants that, adopting the rule as anounced by the court
in its instruction on circumstantial evidence, the testi-
mony was insufficient to show that the chickens   which
defendants sold to Selby for Waters & Coons at Millers-
burg were the chickens which were stolen from Baum-
gartner on the night of the 28th of April, 1906, for the
reason that Baumgartner and wife testified that there
were fifty or sixty chickens stolen, but from their tes-
timony it would appear that more than that number
were stolen and Selby said he bought forty or fifty only.
It is also insisted that the description of the chickens
given by Baumgartner and Selby did not agree, as
Baumgartner said they were all Barred Plymouth
Rocks except three or four of a lighter color, whereas
Selby said they were all Barred Plymouth Rocks ex-
cept three or four of a darker color and one of a lighter
color, and that Baumgartner said the large hen was of
a light color with a mingled neck and a neck darker

than the others, whereas Selby said he bought a large light hen with a light neck, and that the description of the chickens given by Selby was consistent with the description of the chickens owned by the defendant Estes. It was also urged that the admissions of the defendants made to Baumgartner are entirely consistent with their innocence, and taken altogether the evidence raises only a suspicion of the guilt of the defendants. On the other hand, the State maintains that there was substantial evidence to sustain the conviction of the defendants.

The larceny of the chickens on Saturday night, April 28, 1906, was fully established, not only by the testimony of Baumgartner and his wife, but by the statement of Estes to Baumgartner that he knew when the chickens were taken; that they were taken on the 28th of April, and were sold on the 5th of May; that he knew all about it, but he did not get the chickens, and he described the chickens fully to Baumgartner; he said they were nice Plymouth Rock chickens, except the light hen with a mingled neck, and he made to Baumgartner the very damaging statement that when he and his codefendant Johnson were on their way to sell the chickens in Millersburg, he told Johnson as soon as Henry Baumgartner finds out that we sold chickens in Millersburg, "he will be on us," and the defendant Johnson supplements this statements with his evidence to the effect that they entered into a bet that they would be accused of stealing the chickens if they took them to Millersburg and sold them, and that he lost the bet. Not only did Estes go to Baumgartner and indicate his suspicion or solicitude as to being charged with the theft, but defendant Johnson also went to Baumgartner and showed great eagerness in getting the report stopped and requested him not to do anything until he could hear from them, concluding his conversation on the subject by saying. "We will make it all right

with you, if we can; you will wait on us, won't you?'' It is strongly suggestive of a sense of guilt that these two men should make a bet that trouble would grow out of their taking the chickens to Millersburg. Up to that time they had neither of them been accused of stealing the chickens and neither of them had heard that suspicion pointed towards them as the thieves. If this was an honest transaction on their part and the chickens were in fact the property of Estes, which he had turned over to Johnson to pay him as his wages, it is passingly strange that they should make a bet that Baumgartner would prosecute them as a result of their selling at Millersburg. When it is considered that these defendants took these chickens, answering in all substantial respects in description with those which had been stolen from Baumgartner, to Millersburg, a distance of seven miles and in an opposite direction from where they had been doing their trading, to sell, and to merchants with whom they were barely acquainted, and that they arrived there about sun-up when there was a store in half a mile of where they lived, the proprietor of which dealt in poultry, their conduct indicated a desire and purpose to conceal the fact of their selling these chickens. Doubtless the jury regarded their story that they had started that morning to the stock sales in Fulton, when the defendant Estes had testified he had no money and his codefendant Johnson was to pay his expenses, and the chickens brought only $21.58, out of which the expenses of both and the team must be paid, as utterly incredible. The stock sales were not to begin until the Monday following, and it was wholly unreasonable that they would leave the farm where, according to their story, they had a large number of chickens and at least another team of mules, entirely unprovided for and go off to Fulton at daylight Saturday morning and spend two days and two nights in that city on expenses wait-

ing for the stock sales, and especially at that season of the year when their farm required their presence and constant attention. But it was equally strange after the two men had planned to go to Fulton to attend the stock sales, and knowing as well before they started as they did after reaching Millersburg the distance to Fulton, and that the team was unshod and that it looked like rain before they started, to change their minds so suddenly, immediately upon selling the chickens, and receiving the money for them. Doubtless the jury discredited this story as a weak invention to explain their presence at Millersburg with the chickens that morning. There was no evidence that poultry was commanding a better price at Millersburg than at Harg, right at their door, or at Columbia, where they were known and had been accustomed to sell their chickens. This trip indicated a settled purpose to avoid the inevitable suspicion which would have attached to them immediately if they had, so soon upon the heels of the theft of Baumgartner's chickens, offered chickens in number and of the same variety as Baumgartner's to Finley, or at the county seat, Columbia, whither in all probability the rumor of the theft had already reached. Much of the contention of the learned counsel for the defendant is based upon the disagreement between Baumgartner's testimony and that of the defendants, but they overlook the fact that it was for the jury to weigh the evidence of the respective witnesses and if they believed Baumgartner and disbelieved defendants then all seeming conflict vanishes from the case. Defendant Estes and his father accounted for a large number of chickens which they claimed defendant had about that time by stating that defendant's mother gave him five dozen chickens, but it is significant that neither his mother nor sister who of all others would have been able to corroborate his story testified in the case for him. But recurring to the sale at Millersburg, Estes

and Johnson testified that a check to Johnson was given for the chickens, and yet immediately afterwards Estes had it in his possession and cashed it upon buying only a nickel's worth of tobacco. The thought instinctively arises, why pay Johnson in chickens, when only the amount they brought was to be credited on his wages. At no other time was resort had to such unbusinesslike dealing. The jury might have inferred that it was a piece of jugglery to put Johnson forward as the ostensible owner on the idea that he was not so well known in that section as Estes, as the money soon found its way to the pocket of the latter, and the deposit of the check was avoided. But the defendants did not tell Selby they were going to the stock sales but Johnson told him he had started to take the chickens to his mother in Fulton, and after the sale said he was going to send the money to her, when in fact his mother did not live in Fulton, and the probability is that this accounts for the stock-sales story, as the fact could be demonstrated that his statement that he was going to take them to his mother in Fulton could readily be shown to be false. The jury were not bound to believe either of these stories and evidently did not, but treated them as fabrications and evidence of guilt, on the familiar experienc that falshood is the usual comcomitant of crime, whereas truth is the reliance of innocence. [State v. Grubb, 201 Mo. 1. c. 608.] We cannot agree with counsel for defendants that the *corpus delicti* was not established. We think there was no doubt that Baumgartner's chickens were stolen from his messauge on the night of April 28, 1906, and that on the 5th day of May, the defendants sold chickens of the same variety and answering their description very closely, to Waters & Coons at Millersburg. We attach no importance to the failure to show the exact number stolen, for if defendants stole seventy-five or eighty, it did not follow that they would necessarily

take the whole number to Millersburg, as they might without suspicion or comment readily dispose of a small number either to Finley at Harg, or to Berry or Martin in Columbia. The flimsy pretext of the trip to Fulton either to see Johnson's mother or to attend the stock sales and the equally unsatisfactory excuse for abandoning it, both strongly tend to establish that they took the chickens in the night or early morning to Millersburg to conceal their possession of them and as less likely to come to the knowledge of the owner, Mr. Baumgartner, living seven miles away and trading in an opposite direction at Columbia, because if they were honest men selling their own poultry they could and naturally would have disposed of them right at their own doors, for the same price and without the loss of time from their crops or the labor for their team. When these pregnant circumstances are considered, with defendant Estes's statement that he knew exactly when the chickens were stolen and what variety they were, and all about them, but he did not steal them, and the anxiety of both Estes and Johnson to stop the rumor pointing to them, and Johnson's offer to make it all right if he could if Baumgartner would wait on them, we think the testimony passed beyond the point of suspicion and made out a case of substantial evidence pointing almost conclusively to defendant's guilt.

II. Defendants insist they ought to have a new trial on the ground of newly-discovered evidence. Tom Winiger, a witness for the State, testified that he and defendant Estes went home together on the night the chickens were stolen; they left Finley's store at Harg after ten o'clock and parted about one and a quarter miles from Winiger's house. Next morning the witness was in the pasture to defendant's farm with a brother of witness, George Winiger, and Carl Frazier, Kent Sisson and Charles Arnold; the defendant rode

down to them and witness noticed defendant yawn and said to him, "You look sleepy," "What makes you look sleepy?" and defendant Estes replied, "Yes, me and Buck (his codefendant) went to Dick Johnson's after we come from the store." The defendant Estes was recalled and testified he was present in the pasture the next morning as Winiger had testified, with the parties named, but he did not yawn, and Winiger did not remark about it, and he did not tell Winiger he and Buck Johnson went to Dick Johnson's after coming from Harg the night before. He testified he had heard Winiger was to be a witness against him and would testify that he (defendant) looked sleepy and gaped and called his attention to it, but did not know he would testify that defendant said he and Buck Johnson went to Dick Johnson's that night. The affidavit of defendants filed in support of the motion was as follows:

"State of Missouri, County of Boone, ss.

"Richard Estes and Buck Johnson, defendants in the above-entitled cause, make oath and say that all the statements and averments contained in the twelfth reason above for granting a new trial on account of newly-discovered evidence are true.

"RICHARD ESTES,
BUCK JOHNSON.

"Subscribed and sworn to before me this 22 day of October, 1906.

"HUGH M. HALL,
Clerk Circuit Court,
by JAS. E. BOGGS, Dept."

The twelfth ground in said motion is as follows:

"12. Because since the trial of this cause defendants have discovered new evidence, which is material to their defence and is not cumulative merely, nor merely serves to assail or contradict or impeach the credibil-

ity of a witness and which said evidence is fully set forth in the affidavits hereto attached and herewith filed and herewith made a part of this motion. That said evidence is so material that it would probably produce a different result if the new trial were granted. That it was not owing to want of due diligence that said evidence did not come sooner."

This court has on different occasions approved the rules laid down in Berry v. State, 10 Ga. 511, in respect to new trials on the ground of newly-discovered evidence, to-wit, "that the evidence has come to the knowledge of the applicant since the trial; second, that it was not owing to the want of due diligence that it did not come sooner; third, that it is so material that it would probably produce a different result if the new trial were granted; fourth, that it is not cumulative; fifth, the affidavit of the witness himself should be produced or its absence accounted for; sixth, that the object of the testimony is not merely to impeach the character or credit of a witness." [State v. McKenzie, 177 Mo. l. c. 716, and cases cited.]

Tested by this rule, we think the motion was properly overruled. It is obvious that the proposed evidence would only have the effect of impeaching the State's witness Winiger, and would be merely cumulative of the testimony of defendant Estes on that point. Moreover, defendant on the stand testified he knew or heard before the trial that Winiger would be a witness and would testify about defendant looking sleepy and yawning the next morning after the larceny of the chickens. He corroborated Winiger as to the meeting in the pasture next morning and as to the presence of the other witnesses, all of whom lived in the county, and yet he had taken no steps to have any of them subpoenaed. Neither is it probable that if the two new witnesses had been produced it would have changed the result, as they could only have testified

they did not hear the remark of defendant to which Winiger testified.

We think no error was committed in refusing the new trial on this ground.

The judgment is affirmed. *Fox, P. J.,* and *Burgess, J.,* concur.