THE STATE v. LEONARD JENNINGS, Appellant.—34 S. W. (2d) 50.

Division Two, December 20, 1930.

*W. C. McCluskey* and *Harris, Price & Alexander* for appellant.

*Stratton Shartel,* Attorney-General, and *Ray Weightman,* Assistant Attorney-General, for respondent.

DAVIS, C.—In an information filed in the Circuit Court of Boone County by the prosecuting attorney, defendant was charged with burglary and larceny. The verdict of the jury found defendant guilty of burglary, and assessed his punishment at imprisonment in the penitentiary for a term of two years; and further found him guilty of grand larceny, and assessed his punishment therefor at imprisonment in the penitentiary for two years. From the judgment entered on the verdict defendant appealed.

The evidence for the State warrants the finding that, on February 5, 1929, G. A. Laxton and his son, Clarence, a copartnership under the firm name of Laxton & Son, operated a hardware store in the town of Sturgeon, Boone County. Defendant resided with his family some few miles from Sturgeon, but the afternoon of February 4th he spent in Sturgeon, eating supper in a restaurant there. That evening he was with Pete Powers, and in his company and that of others, defendant spent the evening listening to music at a friend's home. A man by the name of Delaney, the owner of a car, residing a few miles from Sturgeon, was also present. Around eleven or eleven-thirty the night of the fourth, they decided to go home, defendant intending to go with Delaney. However, it was found that the lights on Delaney's car were out of order, and some one departed to borrow a lantern to hang on the front of the car. At that time Claude Powers, for whom Pete Powers was waiting, drove up in a Ford, accompanied by Conklin, and addressed defendant. Some one suggested whiskey, and it was decided that they proceed to obtain it. Thereupon defendant and Pete Powers boarded Claud Powers' Ford car and Claud drove them, together with Conklin, to Clark, where defendant attempted unsuccessfully to obtain whiskey. Claud then drove to Renick, where defendant was able to obtain whiskey. After drinking it, they drove to Moberly, alighted at a restaurant, partook of food, and procured whiskey and drank it. Claud Powers then drove them from Moberly through Renick and Clark to Sturgeon, where they arrived between four and five o'clock A. M. on February 5th. Claud and Pete Powers and defendant, on stopping the car four or five blocks from Laxton's store, alighted and roamed about town. On observing Laxton's store, the thought seemed to strike defendant that whiskey was to be found therein and he tried the door, finding it locked. He had an empty pint bottle in his hand, and with whiskey as the lure, he held or had the screen held back, whereupon he threw the bottle through the glass of the door, making a sufficient opening for entry into said store. Thereupon defendant and Claude and Pete Powers entered the store and searched for whiskey. Being unable to discover any, defendant suggested that they take something for their trouble. He tooks guns, pocket knives, flash lights and gloves of the value of $172 or more, and he and Claud and Pete Powers carried them to the car. They drove away, going to the homes of the Powers boys or their kin, where defendant either gave guns to the fathers or kin of the Powers boys or requested that they keep the guns for him. Late the afternoon of the fifth, defendant arrived home. The evidence tends to show that among other things taken from Laxton's store was a hammer, which was found in defendant's smokehouse in a rat hole almost covered with straw, except that the handle was observable.

Defendant's evidence tends to show that he met the Powers boys and Conklin as stated at Sturgeon, and that around or before twelve o'clock on the night of February 4th, he boarded Claud Powers' Ford car, and Claud, with Pete Powers, Conklin and defendant in the car, drove to Clark, Renick and Moberly, obtaining whiskey on the way. On their return, Claud stopped at Renick, defendant alighting from the car and going to the Marshall home, where he stayed the remainder of the night. He arose around six or six-thirty A. M. on the fifth, and, after eating breakfast, proceeded to Renick to catch a car home, when he again met Claud and Pete Powers and Conklin in the car, who said they would take him home. Instead of going home, they turned off the State highway from a quarter to a half mile east of Renick, and went to the home of Pete Powers' father and then to the home of Claud Powers' father. Defendant denied that he was present during the burglary, or that he entered the store, or that he gave a gun to any one. He said he first observed guns in the car around Clark, on the initial trip from Sturgeon to Moberly. Defendant's witnesses testified that Claud Powers' reputation for truth and veracity. was bad, and some of the same witnesses stated that defendant's reputation was also bad. Other evidence will be stated in the opinion.

Defendant does not question the sufficiency of the evidence, but raises procedural errors, which we proceed to consider.

I. Defendant charges that, under Section 3849, Revised Statutes 1919, the information is fatally defective because (a) it was not verified by the prosecuting attorney or by any person competent to testify in the case; (b) it was filed with the circuit clerk by the prosecuting attorney's stenographer.

Before the jury were examined on their *voir dire*, selected and sworn, defendant filed a motion to quash the information and suppress the evidence. The court heard evidence in relation to the matter. The jurat of the circuit clerk was not affixed to the information at the time said motion was filed. The said evidence tended to show that the prosecuting attorney drafted the information and after signing it in two places, handed it to his stenographer to be lodged with the circuit clerk, which was accordingly done. The stenographer testified that she transcribed the information and the prosecuting attorney signed it prior to its lodgment with the clerk. The circuit clerk testified that the stenographer lodged informations with him and that later the prosecuting attorney appeared and made affidavit to them, and then he put them on his book and filed them; that it was his general practice to lay the informations aside. and refuse to file them until the prosecuting attorney had made an affidavit to them; that the information, as shown by his handwriting, was

filed on March 20, 1929; that to his knowledge the prosecuting attorney made affidavit to the information on March 20, 1929, otherwise it would not have been put on; that the filing mark caused him to believe the prosecuting attorney was there on that day; that it was his opinion (belief) that the prosecuting attorney made affidavit to the information, although he had no definite recollection of the prosecuting attorney making the affidavit. On April 3, 1929, the court ordered the circuit clerk to affix his jurat to the affidavit of the prosecuting attorney as of March 20, 1929, as the prosecuting attorney requested.

(a) We have held that an information unverified by the oath of the prosecuting attorney or some one competent to testify as a witness in the case did not meet the requirements of Section 3849, Revised Statutes 1919. [State v. Lawhorn, 250 Mo. 293, 167 S. W. 344; State v. Sykes, 285 Mo. 25, 225 S. W. 904.] However, Section 3853, Revised Statutes 1919, provides that any affidavit or information, at the discretion of the court, when the same can be done without prejudice to the substanial rights of the defendant, on the merits, may be amended in matter of form or substance at any time by leave of the court before the trial, and on the trial as to all matters of form and variance. Before reaching his conclusions and permitting the affixing of the jurat by the clerk to stand, the trial court gave the defendant an opportunity to show injury or prejudice. Defendant failed to make a suggestion. The order to the clerk to affix his jurat to the oath of the prosecuting attorney occurred before the trial and was within the discretion of the trial court. The amendment was a matter of form, but as it was allowed before the jury was called and sworn, it was immaterial whether it was a matter of form or substance. [State v. Baumann, 1 S. W. (2d) 153; State v. Brown, 181 Mo. 192, 79 S. W. 1111; State v. Speyer, 194 Mo. 459, 91 S. W. 1075; State v. Riddle, 23 S. W. (2d) 179.] Moreover, the evidence is sufficient to justify the finding that the prosecuting attorney verified the information on March 20, 1929, but that the circuit clerk neglected to affix his jurat thereto. If he was so sworn by the clerk, the clerk was authorized thereafter to affix the jurat thereto.

(b) We do not think that Section 3849, supra, is to be construed as providing that an information is deemed filed only when manually delivered by the prosecuting attorney to the circuit clerk. The lodgment of an information by the stenographer, clerk or assistant of the prosecuting attorney with the circuit clerk for filing is sufficient. However, the facts herein tend to show that an unverified information was lodged with the clerk by the stenographer of the prosecuting attorney, who later appeared and verified it. It follows then that the information was in fact filed with the clerk by the prosecuting attorney.

II. The prosecuting attorney was permitted by the trial court to indorse on the information on the day of trial the names of seven additional witnesses to be used on the trial. The defendant contends, as a result thereof, that his application for a continuance should have been sustained, or that, because of the indorsement of said names, he should have been afforded the necessary preparations for trial.

We have never held seemingly that it constituted error for the trial court to permit the indorsement of the names of additional prospective witnesses on the indictment or information on the day of trial, although we have said that we disapproved of such action on the part of the prosecuting attorney. [State v. Kuebler, 14 S. W. (2d) 449.] But the question here involves a continuance or at least a postponement of the trial for a few days, and that depends upon a prejudice or injury to defendant resulting from the indorsement of the names of the additional witnesses on the information. The record shows that the only additional witness used in its case in chief by the State was Clarence Laxton. The evidence of Clarence Laxton tends to show that he and his father, George A. Laxton, a copartnership, owned the store that was burglarized. This was merely cumulative of other evidence submitted. Clarence Laxton testified further that, on going to defendant's home a day or so subsequent to the burglary with Constable Moynihan to serve a search warrant, he found a hammer belonging to the firm in a rat hole in defendant's smokehouse, the handle of which he observed in the straw. This hammer he last saw before the burglary in the store. The evidence tends to show that defendant knew shortly thereafter that Clarence Laxton, at the time of serving the search warrant, found the hammer as related. It further tends to show that defendant was not then at home, but that his sixteen-year-old son was there, and that he testified at the trial. The record does not show that defendant, either before or during the trial or by motion for a new trial, could or might have produced evidence at a future time that would have tended to contradict or impeach Laxton's testimony or his character. Prejudice or injury to defendant does not appear. The reasoning in State v. Pinson, 291 Mo. 328, 1. c. 335, 236 S. W. 354, appears sound and to the point.

The other additional witnesses, whose names were indorsed on the information just prior to the trial, testified in rebuttal, and we have held that the statutes requiring the names of witnesses to be indorsed on an indictment or information do not refer to witnesses called in rebuttal. [State v. Bauer, 285 S. W. 82; State v. Cook, 318 Mo. 1233, 3 S. W. (2d) 365.]

III.   Defendant submits that, as it was apparent that he was relying upon the sustention of his application for a change of venue and unprepared for trial, it was error to force him into an immediate trial.

The record discloses that the information was filed in the Circut Court of Boone County on March 20, 1929, and that the trial was commenced on the day it was set, to-wit, April 3, 1929. The record seems to disclose that ten days prior to April 3, 1929, defendant and the prosecuting attorney agreed upon the setting of April 3, 1929, but even though they did not, it will be presumed that defendant had plenary notice of the setting of the cause, in the absence of a showing otherwise. The sustension of an application for a change of venue by the court is ever problematical, and, when a cause is set for trial, notwithstanding the intention to file such application, the defendant should be prepared for the exigencies of events. While courts should be solicitous to see that defendants in criminal cases are given plenary opportunity to prepare for trial, yet it appears, in addition to the agreement of the setting of the cause, that about two months elapsed between defendant's arrest and the trial. The convenience of the court and the welfare of the State, relative to continuances or postponements of trials, must also be taken into consideration, provided always that a defendant has not been denied his legal or fair rights. Defendant was given an adequate opportunity to prepare for trial, and if he did not do so, it was due to his own neglect. [State v. Dalton, 23 S. W. (2d) 1, 4.]

IV.   Defendant further predicates his right to a new trial on the basis of newly-discovered evidence (Sec. 4078, R. S. 1919), making it a ground of his verified motion, which is accompanied by the affidavit of Lloyd F. Rawlings, the discovered witness.

This calls for a further summary of defendant's evidence. It shows that defendant contemplated riding home with Delaney in his car, and that between eleven and eleven-thirty on the night of February 4th, while defendant, Delaney and Pete Powers were awaiting the bringing of a lantern, Claude Powers, accompanied by Conklin, drove up and accosted them. Claud asked what they were doing, and, turning to Pete, desired to know what he had done with his truck. Claude then questioned them regarding whiskey, and Delaney informed him that he knew nothing about any whiskey. Again turning to Pete, Claud said: "Pete, come on, get in the car, we can find some." Pete got in the car and they drove away, returning in thirty or thirty-five minutes. On their return defendant boarded the car. It seems that defendant had been using

a spade belonging to Pete, and Pete said he wanted it to clean out a saw pit the next morning. So, before proceeding to Clark to seek whiskey, they first drove to a lumber pile from which defendant had been hauling lumber, where he surmised the spade was left. He alighted from the car and began searching for it. Claud and Pete also left the car, saying that they intended to go to the truck to get some tools. Claud and Pete returned to the car prior to the return of defendant, but he heard them put some things in the car which he supposed were tools. With defendant sitting in the front seat beside him, Claud then drove to Clark, and, upon stopping under a light, defendant, happening to look towards the rear seat, observed two or three guns there. Claud, in the meanwhile, attempted to get gasoline, and, on his return to the car, on inquiry, informed defendant that they were second-handed, and that in Columbia that day he had traded lumber for them. Defendant did not examine the guns. Defendant further said that, as he started home on February 5th, Claud gave him a claw-hammer to fix a log chain belonging to Claud, which defendant had been using in hauling lumber. Delaney, too, testified that subsequent to the arrival of Claud and his greeting to them while awaiting the lantern, Claud, accompanied by Pete and Conklin, drove away, and in about twenty minutes returned to Delaney's parked car. Defendant then boarded Claud's car and they drove on.

The newly-discovered evidence was to the effect that the witness, Rawlings, was seventeen years of age, and a student at the Sturgeon High School. On the night of February 4, 1929, he called upon a young lady in Sturgeon, leaving her home around eleven-fifteen or eleven-twenty P. M. About eleven-twenty-five, he passed the store of Laxton & Company, and there saw two men and heard them talking in an undertone. They were standing near the sidewalk between the store and a parked car. As he was on the other side of the street, he was unable to see their faces, but in the light of bright street light, he identified, fifty feet away, Claud Powers by his stature and Pete Powers by an old hat he had seen him wearing that day. As he passed on, he heard, on arriving at a church, the breaking and tinkling of glass, as though it was falling into the store, but it was not very plain. He thought nothing of it. Defendant was not with the Powers boys at the time. He had never mentioned these facts to any one until after defendant's trial, when he was heard to say at school that they had convicted the wrong man.

The rules as to granting a new trial on the ground of newly-discovered evidence are to be found in State v. Estes, 209 Mo. 288, l. c. 306, 107 S. W. 1059. One rule reads: "That it is so material that it would probably produce a different result if the new trial were granted." That courts do not favor the sustention of motions

for a new trial on the ground of newly-discovered evidence appears to be accepted. [State v. Bybee, 149 Mo. 632, 51 S. W. 470.] It has been said that the granting or the refusal of a motion for a new trial on this ground is largely within the sound discretion of the trial court. Nevertheless, where the requisites coexist, a new trial should be granted; and many cases reported in the State and Federal reports demonstrate that appellate courts reverse, remand and order new trials, nothstanding the statement that such action is within the sound discretion of the trial court. [16 C. J. p. 1181 et seq.]

Of course, neither a trial nor an appellate court ought to grant a new trial on the ground of newly-discovered evidence, where it is clear that an opposite result would not obtain. To be given thoughtful consideration, such evidence must be material. What then is meant by the word *probably* as used in its connection with the rule mentioned? We think and hold that it means nothing more than that the newly-discovered evidence submitted was credible and reasonably sufficient to produce a different verdict on a retrial; or, that it must be credible and reasonably sufficient to raise a substantial doubt in the mind of a reasonable person as to the result in the event of a new trial. It is said on this subject in State v. Bailey, 94 Mo. 311, l. c. 316, 7 S. W. 425: ''Of course, if it be clear that the new evidence will have no effect upon another verdict, the motion for a new trial should be denied; but if it be doubtful how the evidence would affect the result, the motion should be granted. The court, in such cases, should not attempt to pronounce for the jury in advance, but should give them an opportunity to pass upon the evidence, if competent and material, and to determine its weight for themselves.'' [State v. Murray, 91 Mo. 95, 3 S. W. 397.]

The motion for a new trial avers the other substantial requisites necessary to obtain a new trial on the ground of newly-discovered evidence. The statement of Rawlings, that he observed Claud and Pete Powers about eleven-twenty-five on the night of February 4th, and that as he passed on he heard the breaking and tinkling of glass and that it sounded as though it fell into the store, taken in connection with all the evidence submitted, was credible and sufficient to raise a reasonable and substantial doubt in the minds of a jury, we think, resulting that a jury again should be permitted to pass upon the guilt of defendant. We reach this conclusion the more readily upon taking into consideration the inability of defendant to avail himself of the testimony of the Marshall brothers, notwithstanding he may not have used legal diligence in having them subpoenaed. [Rhea v. State, 67 Tex. Cr. 197, 148 S. W. 578.] We think the following cases tend to support our conclusions: State v. Wheeler, 94 Mo. 252, 7 S. W. 103; State v. Curtis, 77 Mo. 267;

State v. Mahood, 177 S. W. 371; State v. Moberly, 121 Mo. 604, 26 S. W. 364.

The judgment is reversed and the cause remanded for a new trial. *Cooley, C.,* concurs.

PER CURIAM:—The foregoing opinion by DAVIS, C., is adopted as the opinion of the court. All of the judges concur.