STATE of Missouri, Respondent,

v.

Alvin KIRKSEY, Appellant.

No. 63165.

Supreme Court of Missouri,
En Banc.

March 29, 1983.

800

Richard A. Ahrens, St. Louis, for appellant.

John Ashcroft, Atty. Gen., Nancy Baker, Asst. Atty. Gen., Jefferson City, for respondent.

RENDLEN, Chief Justice.

On August 11, 1980, in response to a writ of habeas corpus ad testificandum issued by the United States District Court for the Eastern District of Missouri four officers of the Missouri Department of Corrections conducted five prisoners from the Jefferson City penitentiary to the United States Court House and Customs House in St. Louis. That courthouse is located on the southwest corner of 11th and Market Streets. The officers employed two vehicles, a van containing two unarmed officers and the five prisoners, who were chained and locked in a wired-off section at the rear, and a back-up car with two armed officers. The party left Jefferson City at 6:30 A.M. and arrived at the loading dock on the south side of the courthouse at about 9 A.M.

The two armed officers positioned themselves so they could observe the prisoners, who then began to leave the van at the direction of the other officers. Dennis Kirksey, brother of the defendant, was the first prisoner to leave the van. Instead of walking toward the steps leading into the courthouse he headed for the street, but fell because of his shackles. As one of the unarmed officers was helping him to a standing position, a man appeared near the dock brandishing a shotgun and said, "let him go or I'll kill you." The officers "jumped for cover." One of them maneuvered into position to "put" his gun on the prisoners, fired a shot, and eventually brought the situation under control. At this point it was discovered that Dennis and the man with the shotgun had disappeared and neither could be located by a hasty search of the area.

Defendant was apprehended later, charged with aiding the escape of a prisoner in violation of § 575.230, RSMo, and with armed criminal action in violation of § 571.-015. The jury found him guilty of both counts, recommending a sentence of five years for aiding escape and of life imprisonment for armed criminal action. These were the respective maximums prescribed by statute. The State acting under the assumed compulsion of *Sours v. State,* 593 S.W.2d 208 (Mo. banc 1980), 603 S.W.2d 592 (Mo. banc 1980), moved to nolle prosequi the "aiding the escape" charge. Defendant, sentenced to life imprisonment on the armed criminal action charge, raises numerous claims of error but does not challenge the submissibility of the case. Additional facts will be stated in connection with the discussion of various points raised on appeal. Because this case was argued and submitted prior to the 1982 change in our exclusive appellate jurisdiction, it is retained and decided in the interest of judicial economy, *State v. Martin,* 644 S.W.2d 359, 360 (Mo. banc 1983).

The defendant contends certain letters from his brother Dennis were taken from him pursuant to an unlawful arrest and unlawful search on August 6, 1980, five days before the date of the escape and their admission constitutes reversible error. The letters were virtually incomprehensible but the State sought to introduce them on the theory they contained a secret code used by the Kirksey brothers in plotting the escape.

■ The letters were taken from a room in the St. Louis Ramada Inn, located at 303 South Grand, where defendant and two female companions had occupied a guest room. Registration had been taken in the name of *Allen* Thil or Thill. When the group left the hotel one of the women paid a part of the bill and told the desk attendant that her party did not have the money to pay more and the hotel employees immediately alerted a police officer who had occasion to be on the premises. The officer witnessed the defendant and his female companions leaving the hotel and at that very moment he was informed by hotel employees that defendant had not paid his bill. The officer understandably followed them to the parking lot where defendant had entered a car and was apparently preparing to leave. The officer asked defendant to get out of his car, but he at first

refused to do so. These were sufficient grounds for a reasonable man to believe a crime was being committed and that defendant was committing it. Defendant's claim of an unlawful arrest is without merit. Defendant told the officers his name was *Alvin* Thill and that he was not a guest at the hotel. The hotel manager and the police then entered the room, finding along with personal articles, an open briefcase containing the letters.

The trial judge initially received the letters in evidence over objection on grounds of materiality and unlawful search and allowed them to be read to the jury and displayed on a viewer screen. Before the instructions were read, however, he changed his mind and sustained the prior objections, instructing the jury to disregard the letters. The defendant moved for a mistrial and now claims that the letters were taken in an unlawful search, that they are prejudicial to him, particularly in references to his adherence to the Islam religious tradition, and that the given cautionary instructions were insufficient to dissipate the prejudice.

■ We reject the claim of unlawful search. The defendant expressly negatived any expectation of privacy in the room and contents when he gave a name different from that of the room registration and told the officers that he was not a registered guest of the hotel. The defendant suggests that there is no showing that *Miranda* warnings were given, but this point was not raised at trial and the statements are utilized here not as incriminating statements against the defendant, but only for the purpose of exploring his privacy interest in the room and his attendant Fourth Amendment rights. At the time the police approached defendant he and his companions appeared to be leaving the hotel and "skipping" payment of the bill. After the confrontation the hotel people properly entered the room with the pass key and sought the assistance of the police in doing so. When the defendant responded to the police as he did, he could reasonably expect the room might be entered and the contents seized.

He cannot now claim Fourth Amendment rights in the room or contents which had been abandoned so far as the Fourth Amendment was concerned. *See State v. Hulsey*, 557 S.W.2d 715, 718–19 (Mo.App. 1977).

■ Moreover the letters were expressly excluded from the jury's consideration as they were instructed to disregard them. Though the judge's statements show concern about the search, it was evident from his rulings that he sensed no prejudice in the letters. One of his reasons for excluding the letters appears to be that he thought that they were inconsequential, and of no help to the jury in deciding the case, and he understandably wanted to avoid unnecessary problems. The trial judge's opinion that the letters were not prejudicial, implicit in his denial of the motion for mistrial, must be accorded the weight to which it is entitled and we see no reason to disagree with his assessment. We do not believe that the letters would have the effect of prejudicing the jury because of the references to Islam. The letters were *not* offered in an attempt to arouse religious prejudice, but in pursuit of a theory of relevance (a plan to escape) which impressed the prosecutors more than it impressed the trial judge. Here again we are disposed to defer to the trial judge's apparent determination that the content of the letters, in context, was not prejudicial, and that the situation could be corrected, as was done, by instructing the jury to disregard them.

After the escape the officers immediately called the warden at Jefferson City, who said that he suspected Charles Dinkins, a brother-in-law of the defendant and of Dennis. It was then learned that the defendant had been present at the federal courthouse at 9:30 A.M. on August 11 for a discussion with the probation officer. A photograph of the defendant on hand at the court house was immediately shown to the four officers, who recognized him as the man with the shotgun. The defendant was arrested, as soon as he could be located, and placed in the United States Marshal's hold-

over area. The guards were told to look into the cells in the area before returning to Jefferson City, and they did. Three reported that they saw a large black man who was not the man who had wielded the shotgun. The fourth reported that the man in the cell was neither the man with the shotgun or the defendant. The State argued that, as the result of a mixup, the officers had viewed the wrong man in the holdover; the defense claimed that the officers had viewed the defendant and could not identify him. This is a classic jury issue.

The officers then returned to Jefferson City with the remaining prisoners. The next day, August 12, they were returned to St. Louis where they viewed a lineup containing the suspect Dinkins and none identified him or any person in the lineup as the man with the shotgun. Two officers then looked at a group of photographs and picked that of the defendant. On the following day all four returned to St. Louis to view another lineup, this one containing the defendant, and each of the four identified him as the man with the shotgun.

■ Defendant now claims this identification procedure was unduly suggestive. Because objection was not taken at trial, plain error must be demonstrated. We conclude not only that the plain error claim as to the identification procedure must be denied, but that those procedures fell within permissible limits under the law. The escape presented an emergency situation and when it was discovered that the defendant, who had an apparent motive of aiding his brother, had been in the vicinity it was entirely appropriate to determine as soon as possible whether he was a suspect. Since a photograph of the defendant was immediately available, it was quite in order to show this to the officers, without the delay that would be occasioned by taking time to assemble a homogeneous group of photos. The decision to act promptly and display the photograph in the manner here was a reasonable one. *See Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *State v. Hamblin,* 448 S.W.2d 603 (Mo.1970). That the officers were not subject to any improper suggestion is shown by their subsequent actions at the holdover cell and in the later lineup containing Dinkins.

The officers each described their opportunity to observe the man with the shotgun and the extent of their observation. They had been through an experience not easily forgotten. The jury heard and could assess this testimony. The in-court identification gives every indication of having an adequate independent basis. *See State v. Bibbs,* 461 S.W.2d 755 (Mo.1970); *State v. Davis,* 529 S.W.2d 10 (Mo.App.1975). There was no impropriety, "plain" or otherwise.

■ The defendant argues that there was error in submitting both counts of the information to the jury, even though the prosecutor entered a *nolle prosequi* on the assisting escape count before judgment and sentence. Under the teaching of *Missouri v. Hunter,* —— U.S. ——, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983), it would be entirely proper to charge, try, and convict a person of armed criminal action under § 571.015, in addition to the underlying felony. This defendant got more than that to which he was entitled when one charge was abandoned.

For his next point defendant complains that the substitute information charged escape from "confinement," whereas the instructions submitted escape from "custody." He goes on to argue that the court erred in failing to define "confinement," and in giving an erroneous definition of "custody." A careful examination of the statutes, the information and the instructions demonstrates defendant was not prejudiced.

Section 575.230, RSMo provides in pertinent part:

1. A person commits the crime of aiding escape of a prisoner if he:

\*     \*     \*     \*     \*     \*

(2) Assists or attempts to assist any prisoner who is being held in custody or confinement for the purpose of effecting the prisoner's escape from custody or confinement

\*     \*     \*     \*     \*     \*

The appropriate definitions are set out in § 556.061, the applicable portions of which read as follows:

556.061. *Code Definitions.*—In this code, unless the context requires a different definition, the following shall apply:

\* \* \* \* \* \*

(3) '*Confinement*', a person is in confinement when he is held in a place of confinement pursuant to arrest or order of a court, and remains in confinement until

(a) A court orders his release; or

(b) He is released on bail, bond, or recognizance, personal or otherwise; or

(c) A public servant having the legal power and duty to confine him authorizes his release without guard and without condition that he return to confinement;

\* \* \* \* \* \*

(6) '*Custody*', a person is in custody when he has been arrested but has not been delivered to a place of confinement.

█ The substitute information charged defendant with aiding the escape of Dennis Kirksey, who "was being held in confinement." The verdict director, Instruction 6, required the jury to find, "[f]irst, that Dennis Kirksey was being held in custody by Oliver Burris and Pearl Miller." Instruction 7 reads as follows:

A person is in custody, when, after having been committed to a place of confinement he is being transported under guard to another place and is to be ultimately returned to a place of confinement.

Instructions 6 and 7, in combination, defined the circumstances shown by the evidence in the case with scrupulous accuracy. The defendant may be correct in asserting that Dennis' situation more accurately reflects the statutory definition of "confinement" than that of "custody," since he had been delivered to a place of confinement and had not been discharged from confinement in any of the ways specified in the statute. The "custody" definition appears to apply only to a prisoner who has not yet reached a place of confinement. In terms of common speech, however, it would be much more appropriate to say that Dennis was in custody and not in confinement while being transported to the federal courthouse. "Custody" is a term of ordinary speech. The jury could have been instructed by using the term "confinement" and then defining it essentially by reading § 556.061(3), (a), (b) and (c), as the State requested, but the method followed by the court was clearer and more understandable under the circumstances of this case. The court might have been on safer ground if the case had been submitted in accordance with Note on Use 5 to MAI–CR 29.78.2, but here the deviation was absolutely non-prejudicial. There really was no doubt about Dennis' status as a prisoner under close restraint. The parties stipulated that Dennis Kirksey was a prisoner in the Missouri State Penitentiary. In attempting to free a person so restricted, the evidence showed a violation of § 575.230, and the jury was told in understandable terms what it had to find in order to find the defendant guilty of that offense.

█ Defendant next argues that the offense was committed wholly on federal property and that, therefore, only the federal government has jurisdiction to try the defendant. The parties have adduced the available information as to the cession of the block in which the courthouse is located to the federal government. We do not need to enter into a detailed analysis of the title to that realty for two reasons. First, the evidence shows that the offense was committed in part on the sidewalk and street on the south of the federal property. There was evidence that the man with the shotgun was in the street. The street and sidewalk were under the control and maintenance of the City of St. Louis. If an offense is committed partly on federal and partly on non-federal property, both sovereigns have jurisdiction. *Leonard v. United States,* 500 F.2d 673 (5th Cir.1974). It makes no difference whether the city has a fee interest or only an easement in the street and sidewalk. Both are property rights which will support the exercise of jurisdiction. The same conduct may consti-

tute an offense against two sovereigns, and may be prosecuted by both. *Bartkus v. Illinois,* 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959).

Second, an escape is not complete until the escapee frees himself from the restraints under which he has been placed. This escape was successful. Dennis got out of sight of the armed officers and could not be found in the area. He made his way from the federal property into the world at large. It simply cannot be said that the escape and the offense of aiding escape were committed wholly on federal property.

We do not necessarily agree that the State is without the power to punish an offense which is so important to the State's interest and involves a person held under order of the state courts, simply because the operative facts took place in a federal enclave, and are aware of no case holding the contrary. However, because of the facts just detailed, we need not decide this broader question.

■ The defendant's argument that Dennis was in the custody of the United States rather than of the State of Missouri is wholly lacking in merit. He was a State prisoner being guarded by State officers, and the federal government entered only because he had been called to testify in the federal court. The federal court was indifferent to the manner in which he was restrained, so long as he appeared for the required testimony. The escape, furthermore, took place before the prisoners were delivered to the federal authorities to testify. The State supplied the restraints from which Dennis was freed. The report of the case of *United States v. Farley,* 424 F.2d 255 (4th Cir.1970), cited by defendant does not show whether state or federal officers transported the state prisoner to federal court. But be that as it may, we hold the escape and the aiding of it were also offenses against the state.

■ After the trial one Johnny Jones appeared and expressed his willingness to testify that he, rather than the defendant, had been the man who appeared with the shotgun. If Jones had appeared at the trial then the jury could have accepted his testimony or not, as it saw fit, and the court would have no office in assessing credibility. The situation is different, however, after the defendant has been tried. The court is not required to grant a new trial, even if all possible diligence has been exercised in locating the after-discovered witness. There may be an assessment of the credibility of the proposed testimony by the trial court. *State v. Jennings,* 326 Mo. 1085, 34 S.W.2d 50, 54 (Mo.1930); *State v. Thompson,* 610 S.W.2d 629, 633 (Mo.1981), cert. den. 454 U.S. 840, 102 S.Ct. 148, 70 L.Ed.2d 122 (1981). The record adequately supports the trial judge's detailed findings and conclusions. Besides the trial judge's observations on demeanor, the story about using a sawed-off BB gun, and about Dennis Kirksey's casual asking him where the getaway car was parked, is simply incredible. The court was not obligated to grant a new trial under these circumstances.

■ The defendant next argues that trial counsel was incompetent. Although this claim is usually raised in a collateral proceeding there are some cases in which this point may be properly raised in appeal from the initial conviction. *State v. Cluck,* 451 S.W.2d 103, 106–07 (Mo.1970). In this case, however, the complaint is about the failure to object to the evidence obtained in the search of the briefcase at the motel until offered in trial, to the identification testimony, and to the method of submission. We have found that these matters were handled in a manner free from error, and so there is nothing to show that objections would have been of any benefit to the defendant. Even if the issue of federal jurisdiction is a jury issue (which we do not decide), we see no substantial likelihood that it would be decided in the defendant's favor, based on our view of the governing law. We are unable to see that counsel did anything or on the other hand failed to do anything which, had it been managed differently, might have provided a different result. A perusal of the transcript shows that the defense was vigorous, with all leads being explored. Nothing has been

shown rising to a level of deprivation of the constitutional right to counsel.

■ The defendant argues in a supplemental point that he did not have the means to take depositions of the State witnesses, and that application for funds for this purpose was denied. We are aware of the holding by the United States Court of Appeals in *Williamson v. Vardeman*, 674 F. 2d 1211 (8th Cir.1982), that the State must provide reimbursement for the necessary expenses of conducting a defense. This defendant, however, has not taken proper steps to preserve the complaint for our review. There has been no showing, for example, that alternate methods, such as asking that the State employed witnesses be made available for interviews, would not have been sufficient. We believe also that one claiming fundamental error in failing to afford funds for adequate trial preparation should make a challenge before trial, by extraordinary writ, motion for additional preliminary hearing, or otherwise, rather than simply making a motion for advancement of funds, abiding the result of the trial hoping for an acquittal, and then raising the denial of the motion on appeal if unsuccessful. The officers were extensively cross examined and it is doubtful that deposition testimony would have been of material assistance. There is no showing which obliges us to take action on the claim.

We conclude that the defendant was properly tried and convicted. The judgment is affirmed.

All concur.

BILLINGS and BLACKMAR, JJ., not participating because not members of the Court when cause was submitted.