**STATE of Missouri, Respondent,**

v.

**Zackary Lee STEWART, Appellant.**

**No. SC 90503.**

Supreme Court of Missouri,
En Banc.

May 25, 2010.

Rehearing Denied June 29, 2010.

Rosalynn Koch, Public Defender's Office, Columbia, for Appellant.

Karen L. Kramer, Atty. General's Office, Jefferson City, for Respondent.

MARY R. RUSSELL, Judge.

Zackary Lee Stewart was convicted of first-degree murder and sentenced to life imprisonment without the possibility of parole. He appeals after being denied a new trial, asserting that a new trial is warranted because newly discovered evidence indicates that his brother-in-law, whose DNA was found on a bloody hat at the crime scene, stated that he had killed someone and that he was present at the victim's murder. Zackary argues that this new evidence, particularly considered in light of the DNA evidence, raises a substantial doubt as to his guilt. This Court agrees that the newly discovered evidence merits a new trial. The judgment is reversed, and the case is remanded.[1]

## I. Background

The evidence at trial showed that David Dulin (Victim) called 911 shortly after midnight November 29, 2006, and stated that two white men in their 20s and 30s had come into his home near Hurley and shot him twice in the head with a .22. While he lay dying, Victim told the 911 operator that he did not know who shot him, but he stated that the assailants were from Hurley and that one of the men said he was the "Eby girl's boyfriend."

Zackary was an 18-year-old high school senior at the time of Victim's murder. His mother is Paula Eby (Mother), and his sisters include Candy Seaman and Christy Pethoud. At the time of Victim's murder, Candy was married to Tim Seaman, and Christy was living with Leo Connelly.

---

1. This Court has jurisdiction over this case pursuant to Mo. Const. art. V, sec. 10, as this case was taken on transfer after its disposition by the court of appeals.

When investigators contacted Zackary, he told them that he had no knowledge of Victim's murder, but he did volunteer non-public information (when the crime purportedly occurred and the caliber of weapon involved). He stated that if he was going to kill someone he would not use a .22 caliber weapon, "something he would have to shoot four or five times with to kill them."

Zackary again was interviewed regarding Victim's murder while he was jailed on a separate charge a few months later. A sheriff's detective told Zackary that a witness had seen him, his sister Christy, and Christy's boyfriend, Leo, in a car on a road near Victim's home the night of the murder. Zackary was asked if there might be a reason for his DNA to be at the crime scene.[2] He also was told that the murder weapon had been found.[3] Zackary maintained that he was not involved, that he did not know anything, and that he had never left Christy's home that night.

Zackary was placed in an isolation cell while searches were conducted. He later requested to talk to the detective. Crying, scared, and upset, Zackary told the detective that he thought Leo was responsible for Victim's murder. Zackary did not say why he thought Leo was responsible, but he observed the short distance between Victim's and Leo's residences. He said he had been at Christy and Leo's home the night of Victim's murder and stated that he had not left the home that night.

After this interview, Zackary again was put in an isolation cell while searches were conducted. He continued to assert that he had no involvement in Victim's murder and said he had given the matter over to God.

Zackary eventually was returned to the cell he shared with Coty Pollard and Victor Parker. Pollard and Parker later approached investigators to report what Zackary had recounted to them about Victim's murder, and they both testified for the State at Zackary's trial. They offered the following account of the murder: Zackary went to Victim's home the night of the murder with Christy, Leo, Mother, and Mother's boyfriend (Mark Myers) and his son (Robert Myers); the group went there planning to "take his dope;" they arrived in two vehicles (Zackary, Christy, and Leo were in a white Ford Escort; Mother, Mark, and Robert were in a Jeep Cherokee); Zackary and Robert guarded Victim while the others searched for drugs; Victim pulled a gun; Victim and Zackary struggled before Zackary wrestled the gun away and shot Victim multiple times; the group panicked and left the scene (Leo and Zackary left in the Escort; the others left in the Cherokee); they changed their clothing and burned the clothes they had been wearing in a barrel that they threw in the river; and they decided Leo was to dispose of the gun.

Zackary's defense counsel cross-examined Parker and Pollard about their influence over Zackary,[4] and she suggested

2. Despite this question being asked, there was no evidence of Zackary's DNA being found at the crime scene.

3. The .22 used in the murder had been previously discovered during a vehicle stop in Springfield about two and half months after the shooting. It was in the possession of a person unconnected to Zackary.

4. While Pollard was near Zackary's age, Parker was older. Pollard and Parker had been

acquainted before becoming cellmates. Parker and Pollard advised Zackary that they could help him if he told them the truth about his involvement in Victim's murder. They advised him to stay in his cell, suggesting that investigators would know he was guilty if he came out. They also advised him to give them all of his food, telling him that not eating would make him look innocent. Parker told Zackary that he could help him bond

that they had received favors from investigators or the prosecutor in exchange for testifying against Zackary.[5] But Zackary called only one witness in his defense—his sister Christy—who testified that no one left her house the night of Victim's murder.[6]

Before Zackary's trial concluded, Victim's family informed the State that they had never seen Victim with the bloody hat that was found at the crime scene and introduced into evidence at trial.[7] The hat was tested for DNA the third day of Zackary's trial, and the jury was provided the preliminary DNA results indicating that neither Zackary's nor Leo's DNA was found on the hat. The jury was told that the hat contained DNA from three people—Victim, Zackary's brother-in-law Tim, and another unknown person.

During closing arguments, the prosecutor argued that the preliminary DNA information from the bloody hat reflected a DNA "hit" to Tim made by an investigative database. He stressed that it was not a DNA "match" confirmed by comparing it with Tim's actual DNA. He also highlighted that Tim was not identified at trial as a person who was with Zackary during Victim's murder. The jury found Zackary

guilty of first-degree murder, and he moved for a new trial.

Zackary's motion for a new trial included arguments that newly discovered evidence entitled him to a new trial because it would lead to a different result at a new trial. He asserted that, after his trial, new evidence was discovered indicating that Tim had told his brother that he had murdered Victim.

A hearing was held on Zackary's motion, but the defense was unable to locate Tim. Tim's brother failed to appear to testify, but the State agreed to waive hearsay objections to a detective testifying about what Tim purportedly told his brother.

The detective stated that, after Zackary's trial, he had received a tip that Tim had disclosed to his brother that he had "taken someone's life." Tim did not indicate whose life he took, but his brother stated that he had not taken Tim's statements seriously until after he heard about the bloody hat found by Victim's body. The brother stated it was Tim's hat or a hat identical to the one Tim had for a long period of time.[8] The brother also indicated that Tim drove a light tan or white vehicle.

Tim's nephew also testified at the motion hearing.[9] The nephew testified that

out, hire a lawyer, and get a change of venue to Greene County.

5. Pollard was in jail on a probation violation for burglary, theft, receiving stolen property, and tampering. He later was continued on probation. Parker was jailed on a probation violation stemming from drug charges and was released on his own recognizance before his sentencing.

6. Christy testified that, despite having smoked marijuana earlier in the evening, she was certain no one left her house the night of the murder because her dogs and donkey would have made noise and alerted her if a vehicle had left her driveway.

7. Investigators had believed it was Victim's hat because it was found on the floor next to his body, was covered with blood, and had a tear in an area coinciding with a bullet hole in his head.

8. The detective testified that he had interviewed Tim, who denied ever owning the hat. And people who knew Tim gave the detective conflicting reports about whether Tim owned a similar hat.

9. The State suggests that Zackary failed to preserve his argument as to the nephew's testimony because he did not detail Tim's statements to the nephew in his motion for new trial. The State, however, did not object

Tim had confided to him the morning after Victim's murder that Tim and his friend, John Mills, were at Victim's house when Victim was killed.[10]

Zackary argued that the credibility of Tim's alleged statements to his brother and nephew were bolstered by the fact that the DNA evidence on the bloody hat was confirmed after trial as a match to Tim. He also asserted that the confirmed DNA evidence would have altered the jury's view of his case, as it would have obviated the prosecutor's closing arguments that the DNA evidence showed a "hit" but not a "match" to Tim.[11] The trial court, however, found that Tim's alleged statements were not exculpatory to Zackary, and it concluded that a new trial was not warranted.

## II. Issue on Appeal

Zackary argues that the trial court's refusal to grant him a new trial denies him a fair trial. He maintains that the newly discovered evidence of Tim's statements to his brother and nephew, when considered with the now-confirmed DNA evidence, makes it likely that he would obtain a different result at a new trial. He asserts that the new evidence establishes a reasonable alternative theory of his innocence—that Tim killed Victim.

## III. Standard of Review

■ Rule 29.11 provides that the court may grant a new trial "upon good cause shown." New trials based on newly discovered evidence are disfavored, and the trial court has substantial discretion in

to the nephew's testimony at the motion hearing.

**10.** The detective testified that he did not have evidence putting John Mills at the scene of Victim's murder, but he was told that Tim and Mills "ran around together."

deciding whether a new trial should be granted. *State v. Amrine,* 741 S.W.2d 665, 674 (Mo. banc 1987). Because of this substantial discretion, the trial court's decision will be affirmed unless this Court finds it abused its discretion. *State v. Rutter,* 93 S.W.3d 714, 730 (Mo. banc 2002). An abuse of discretion occurs when the trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *Fleshner v. Pepose Vision Inst.,* 304 S.W.3d 81, 87 (Mo. banc 2010).

To obtain a new trial on the basis of newly discovered evidence, Zackary was required to show: (1) the facts constituting the newly discovered evidence came to his knowledge after the trial; (2) his lack of prior knowledge was not owing to want of due diligence on his part; (3) the newly discovered evidence is so material that it is likely to produce a different result at a new trial; and (4) the evidence is not merely cumulative evidence or evidence impeaching a witness's credibility. *State v. Terry,* 304 S.W.3d 105, 109 (Mo. banc 2010).

## IV. Is a new trial warranted?

■ The parties agree that Zackary's newly discovered evidence meets three of the four prongs for assessing whether it merits a new trial: the evidence was not known at trial; its being unknown was not attributable to a failure of due diligence by the defense; and the newly discovered evi-

**11.** Zackary argues that it is newly discovered evidence that the DNA hit on the hat was confirmed after trial as a match to Tim, but he also admits that the "the match is not completely new evidence" insofar as "[t]he DNA hit on Tim Seaman was proven at trial by a stipulation."

dence is not merely cumulative or impeaching. The remaining issue is whether the newly discovered evidence is so material that it is likely to produce a different result on retrial. Evidence is considered to likely produce a different result at a new trial if it is credible and reasonably sufficient to raise a substantial doubt in the mind of a reasonable person as to the result of a new trial. *State v. Jennings*, 326 Mo. 1085, 34 S.W.2d 50, 54–55 (1930).

### A. The newly discovered evidence is credible

▪▪▪ The State's arguments at the motion hearing challenged the admissibility of the new evidence, arguing that it was inadmissible hearsay. In assessing the availability of a new trial, however, the court's task is to assess the credibility of the newly discovered evidence, not to conjecture as to its future admissibility. *See id.* After all, the evidence may be offered differently at a new trial.

Courts have noted that self-incriminatory statements that are made to close family members shortly after an alleged crime, that also are corroborated by confirmed DNA evidence, carry substantial indicia of reliability that lends to their trustworthiness. *See, e.g., Chambers v. Mississippi*, 410 U.S. 284, 300–01, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (noting in a discussion about exceptions to the inadmissibility of hearsay that a substantial indicia of reliability was established where the statements at issue were made spontane-ously to a close acquaintance shortly after the murder, were corroborated by some other evidence in the case, and were self-incriminatory and unquestionably against interest).

The circumstances under which Tim's alleged statements were made lend credence to their credibility: Tim's purported statements to his nephew about his presence at the crime scene were made the day after Victim's murder and were corroborated by Tim's DNA being found on the bloody hat at the crime scene;[12] Tim's purported statements to his brother were uttered shortly after Victim's murder and were made spontaneously in the context of the brothers' conversation about family issues.[13]

The credibility of Tim's alleged statements is additionally enhanced by the fact that the evidence was generated by his family members—presumably Tim's brother and nephew would be more likely to lie to protect Tim, not to vilify him in an effort to protect Zackary. *Cf. State v. Rogers*, 758 S.W.2d 199, 200–01 (Mo.App. 1988) (noting the untrustworthiness of statements offered in support of a defendant by his own friends and relatives; suggesting that trustworthiness requires a neutral interest toward the defendant).

Zackary persuasively argues that the newly discovered evidence of Tim's alleged statements is credible for purposes of granting a new trial.

---

12. The nephew testified that Tim was the first person to tell him about Victim's murder. He stated that, the morning after Victim's murder, he witnessed Tim's friend Mills vomiting, and Tim explained that Mills had vomited "because of what he saw the night before." The nephew agreed that Tim had "told [him] that the reason [Mills] was throwing up was because he had seen the guy get killed."

13. The detective testified at the motion hearing that Tim's brother stated that he had been drinking with Tim "around Thanksgiving" in November 2006 and that Tim was "crying to him about problems he was having with his estranged wife, Candy Seaman, and the kids, and then the subject shifted to . . . him having taken someone's life, and asking how you deal with that."

## B. The newly discovered evidence raises a substantial doubt

 The State's theory at trial was that Zackary and Leo were the two men Victim referred to in his 911 call. But because no forensic evidence connected them to the crime scene, the State relied on the testimony of Zackary's two cellmates to convince the jury of Zackary's guilt. The newly discovered evidence relating to Tim's purported statements to his brother and nephew, particularly when considered with the now-confirmed DNA evidence linking Tim to the scene, raises serious doubts about the State's theory of the case.

If presented to and believed by the jury, Zackary's newly discovered evidence allows him to present an alternative theory in his defense beyond his sister's testimony that he did not leave her home the night of Victim's killing. During retrial, it is likely that the newly discovered evidence will produce a different result because the jury will conclude that the two men referenced by Victim were Tim (who was married to an "Eby girl" and drove a light-colored vehicle) and another person, not Zackary, who contributed the unknown DNA found at the scene.[14] For these reasons, Zackary's new evidence meets the criteria of being reasonably sufficient to raise a substantial doubt in the mind of a reasonable person as to the result if he is retried. *See Jennings*, 34 S.W.2d at 54–55.

## V. Conclusion

The newly discovered evidence offered by Zackary in support of his motion for a new trial warrants a new trial. The trial court's judgment is reversed, and the cause is remanded.

All concur.

---

14. In addition to the unknown person's DNA on the bloody hat, Zackary's motion for a new trial also asserted that after-trial DNA testing revealed that an unknown person's DNA was found on dentures at the crime scene.