

# In the Missouri Court of Appeals
# Eastern District

<u>DIVISION FOUR</u>

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED100795 |
| | ) | |
| Plaintiff/Respondent, | ) | Appeal from the Circuit Court |
| | ) | of St. Charles County |
| v. | ) | |
| | ) | |
| SCOTT MARSHALL DAVIS, JR., | ) | Honorable Daniel G. Pelikan |
| | ) | |
| Defendant/Appellant. | ) | Filed: September 8, 2015 |

<u>Introduction</u>

Scott Marshall Davis, Jr. (Appellant) appeals from the trial court's judgment entered upon a jury verdict convicting him of first-degree assault, armed criminal action, and first-degree assault of a law enforcement officer. We affirm.

<u>Factual and Procedural Background</u>

Appellant does not contest the sufficiency of the evidence to support his conviction. The evidence, viewed in the light most favorable to the verdict, is as follows.

On April 17, 2012, Catherine Naber (Naber) drove Appellant and his stepbrother, Elijah Daniel (Daniel), to Appellant's father's home. On the way, Naber gave Appellant and Daniel some LSD that someone had given her at a party.

Later that evening, Appellant suddenly attacked Daniel and Naber tried to intervene. Appellant's father came out of a back bedroom and helped get Appellant off Daniel. After the attack, Naber went down the hall to the bathroom and called her

husband.  When Naber returned to the living room, they tried to calm Appellant down. Appellant had taken off his clothes, was making "random statements," and was holding a club with metal spikes.  Appellant told Naber, "You're next," pinned her down on the couch, and hit her with the club.  Naber managed to get the club away from Appellant and ran to the bathroom.

Naber eventually left the bathroom and called 911.  While in the living room looking for her glasses and keys, Appellant became remorseful and helped her clean up. Appellant said something about his sister being raped and his cousin getting killed. Naber ran out of a side door, locked herself in her van, and called her husband and 911 again.

Officer Tom Kenyon (Kenyon) was dispatched to the home around 2:00 a.m. When Kenyon arrived, he saw a van backing out of the driveway and Appellant, naked, who appeared to be climbing through the driver's side window.  Kenyon blocked the van with his patrol vehicle and got out.  Appellant walked to the front of the van.

Kenyon tried to talk to Appellant, but Appellant was speaking "gibberish." Appellant had blood on his upper torso and arms and said his name was "Lucifer." Appellant charged Kenyon, who stepped to the side to avoid contact with Appellant. Kenyon drew his Taser and fired it at Appellant, hitting Appellant in the chest.  Appellant stated, "A Taser? That's all you f***in' got?"

Appellant charged Kenyon again and Kenyon attempted to tase him.  Instead of hitting Appellant, Kenyon came into contact with the deployed wires and tased himself. Appellant grabbed Kenyon's wrist and drove the Taser into Kenyon's nose before Kenyon was able to throw the Taser into the street.

2

During the altercation, Appellant said he was going to "eat" Kenyon, and bit Kenyon on the left cheek and the right ear. Kenyon punched Appellant in the head and Appellant threatened to kill Kenyon. As the men struggled, Kenyon tripped and fell on his back and Appellant fell on top of him. Kenyon tried to stand up but Appellant hit, choked, and head-butted him. At one point, Kenyon felt Appellant's arm near his holster. Kenyon attempted to radio for help and Appellant bit Kenyon's elbow.

One witness testified to seeing Appellant on top of Kenyon, "pounding him in the face" and reaching for Kenyon's gun. Another witness testified she saw Appellant standing over Kenyon, swinging at him six or seven times, and that Kenyon seemed "defenseless."

Kenyon got to his knees but was "[v]ery light headed" and was having difficulty breathing. Kenyon secured the retention strap to his weapon and felt Appellant tugging on it. Appellant began choking Kenyon and Kenyon drew his weapon and fired. Appellant got off of Kenyon and Kenyon stood up, at which time Appellant charged Kenyon, Kenyon fired his weapon, and Appellant fell to the ground.

When additional officers arrived at the scene, they found Appellant sitting on the ground, covered in blood, rocking back and forth, and "speaking in tongues." Officers had to tase Appellant twice before they could subdue him and take him into custody. Appellant, who had been shot twice, was taken to the hospital for medical care. Kenyon was treated at the hospital and required surgery on his left shoulder. Kenyon lost some use of his left arm and was placed on light duty for seven or eight months. Naber was left with multiple scars and suffered a broken jaw, which required surgery and her jaw wired shut for seven weeks.

Appellant was interviewed twice at the hospital. Appellant admitted taking LSD, said he was confused about the events that night and that he had believed his sister had been raped by Daniel. Appellant stated he knew Kenyon was a police officer and that he charged the officer, tried to bite him, and tried to get shot by the officer. Evidence of Appellant's telephone calls made from jail was also admitted at trial. In those calls, Appellant stated Naber had not forced the LSD "down [his] throat" and that he had attacked Kenyon. Appellant's DNA was found on the Taser, the grip of the club, and Kenyon's firearm.

The State charged Appellant with first-degree assault (Count I), armed criminal action (Count II), and first-degree assault of a law enforcement officer (Count III). As to Count I, the trial court instructed the jury on the charged offense of assault in the first degree and on the lesser-included offense of assault in the second degree based on the theory that Appellant recklessly, instead of knowingly, caused serious physical injury to Naber. The court refused to submit Appellant's proffered instruction on the included offense of assault in the second degree based on Appellant's knowingly causing serious physical injury to Naber "under the influence of sudden passion arising out of adequate cause."

After deliberation, the jury found Appellant guilty of the charged offenses. Additional evidence and argument were presented to the jury in the penalty phase of the trial. The jury recommended sentences of 10 years for first-degree assault, 5 years for armed criminal action, and 15 years for first-degree assault on a law enforcement officer.

4

On November 18, 2013, after hearing evidence and argument on Appellant's post-trial motion alleging he was entitled to a new trial based on newly discovered evidence, the trial court denied the motion.

The trial court sentenced Appellant to concurrent terms of 10 years for assault and 5 years for armed criminal action, and a consecutive term of 15 years for assault of a law enforcement officer, for a total of 25 years' imprisonment. This appeal follows. Appellant raises 10 points of error on appeal.

Discussion

Point I – Lesser-Included Instruction

In his first point, Appellant argues the trial court erred in refusing his request for an instruction on second-degree assault based on sudden passion. We review the trial court's decision to give or refuse a requested instruction *de novo*. State v. Jackson, 433 S.W.3d 390, 395 (Mo. banc 2014).

The trial court is obligated to give an instruction on a lesser-included offense when (1) a party timely requests the instruction; (2) there is a basis in the evidence for acquitting the defendant of the charged offense; and (3) there is a basis in the evidence for convicting the defendant of the lesser-included offense for which the instruction is requested. Jackson, 433 S.W.3d at 396; State v. Johnson, 284 S.W.3d 561, 575-76 (Mo. banc 2009). There is almost always a basis in the evidence for acquitting a defendant of the immediately greater offense because the jury has a right to disbelieve all, some, or none of the evidence presented in a particular case. Jackson, 433 S.W.3d at 399.

"[T]he jury's right to disbelieve all or any part of the evidence, and its right to refuse to draw any needed inference, is a sufficient basis in the evidence to justify giving

5

any lesser included offense instruction when the offenses are separated only by one differential element for which the state bears the burden of proof." Jackson, 433 S.W.3d at 401. A "nested" lesser-included offense is one which is separated from the greater offense by one differential element for which the state bears the burden of proof. State v. Randle, No. SC 94646, 2015 WL 4627381 at *2 (Mo. banc Aug. 4, 2015). A "nested" lesser-included offense consists of a subset of the elements of the greater offense, therefore rendering it impossible to commit the greater offense without necessarily committing the lesser. Id. A defendant is entitled to a properly requested instruction on a "nested" lesser-included offense and does not have to introduce affirmative evidence or cast doubt over the State's evidence. Id., quoting Jackson, 433 S.W.3d at 401-02.

Section 565.050.1,[1] in pertinent part, defines first-degree assault as knowingly causing serious physical injury to another person. Section 565.060.1(1) defines second-degree assault as knowingly causing serious physical injury to another person under the influence of sudden passion arising out of adequate cause. Thus, the only difference between assault in the first degree as charged and assault in the second degree as requested by Appellant was whether Appellant acted "under the influence of sudden passion arising out of adequate cause." Appellant had the burden of injecting the issue of influence of sudden passion arising from adequate cause. Section 565.060.2; State v. Redmond, 937 S.W.2d 205, 208 (Mo. banc 1996). The issue is not submitted to the jury unless it is supported by the evidence. Redmond, 937 S.W.2d at 208.

Sudden passion is defined as "passion directly caused by and arising out of provocation by the victim or another acting with the victim which passion arises at the time of the offense and is not solely the result of former provocation." Section

---

[1] All statutory references are to RSMo 2006.

565.002(15). Adequate cause is defined as "cause that would reasonably produce a degree of passion in a person of ordinary temperament sufficient to substantially impair an ordinary person's capacity for self-control." Section 565.002(1).

The inquiry here is whether the testimony presented at trial would support a finding that Appellant acted under the influence of sudden passion arising from adequate cause. While second-degree assault based on sudden passion is a lesser-included offense of first-degree assault, it is not a "nested" lesser-included offense. Second-degree assault based on sudden passion is not a subset of the elements of first-degree assault and it is not "impossible to commit" the higher offense without necessarily committing the lower offense. See Randle, No. SC 94646, 2015 WL 4627381, at *2. In this case, second-degree assault includes an additional element not present in the greater offense, specifically the presence of sudden passion arising from adequate cause. See State v. Price, 928 S.W.2d 429, 431 (Mo. App. W.D. 1996) (sudden passion arising from adequate cause is an element of the crime, requiring a jury finding). Nor are the offenses separated by "one differential element for which the [S]tate bears the burden of proof." See Randle, No. SC 94646, 2015 WL 4627381, at *2. As already noted, it is the defendant who has the burden of injecting the issue of sudden passion and there must be evidence supporting the element before the issue will be submitted to the jury.[2]

---

[2] In this case, the trial court did instruct the jury on a "nested" lesser-included offense. The court instructed the jury on the charged offense of first-degree assault (knowingly causing serious physical injury to another) and on second-degree assault (recklessly causing serious physical injury to another). Section 562.021.4, regarding culpable mental states, provides that "[w]hen recklessness suffices to establish a culpable mental state, it is also established if a person acts purposely or knowingly." Second-degree assault based on recklessness is a subset of the elements of first-degree assault and the offenses are separated by one differential element for which the State bears the burden of proof. See State v. Randle, No. SC 94646, 2015 WL 4627381 at *2 (Mo. banc Aug. 4, 2015), and State v. Roberts, No. SC 94711, 2015 WL 4627393 at *2 (Mo. banc Aug. 4, 2015) (finding different *mens rea* requirements are differential elements of which the State bears the burden of proof when the remaining elements of the offenses remain the same).

7

Redmond, 937 S.W.2d at 208. Only after the defendant has properly injected the issue does the State have the burden of disproving the issue. Price, 928 S.W.2d at 431.

Appellant failed as a matter of law to present evidence that he was under the influence of sudden passion arising from adequate cause within the meaning of Section 565.060. At the instruction conference, defense counsel argued Naber's act of supplying Appellant with LSD caused him to hallucinate and that those hallucinations resulted in sudden passion. Appellant's theory, however, convolutes the concept of provocation by ignoring pivotal intervening events, namely Appellant's acceptance and voluntary ingestion of the drugs.

That Appellant's ingestion of the LSD was voluntary is particularly relevant, in that:

> [A] jury may not consider [voluntary] intoxication on the issue of the defendant's mental state." State v. Erwin, 848 S.W.2d 476, 482 (Mo. banc 1993). This rule, reiterated by the legislature in section 562.076.3, RSMo 1994, is over a century old and recognizes that a voluntarily intoxicated person maintains his or her responsibility for his or her conduct. A person who voluntarily puts himself or herself into a drugged condition is capable of forming an intent to kill. That the drugs may remove a person's inhibitions and make the person more likely to act rashly, impulsively and anti-socially and increase the person's susceptibility to passion and anger does not alter the person's capacity to intend to kill.

State v. Roberts, 948 S.W.2d 577, 588 (Mo. banc 1997). To the extent that Appellant's argument is an attempt to show that his voluntary ingestion of LSD negated the "knowing" mental state, it is not permissible.

Stated another way, "[s]udden passion is an unexpected force, motivated *by another's provocation*, that subdues the prior mental state momentarily in causing a responsive act." State v. Hahn, 37 S.W.3d 344, 351 (Mo. App. W.D. 2000) (emphasis added). The alleged sudden passion, the hallucinations, were caused by or arose out of

8

Appellant's own act of voluntarily ingesting the drugs and were not motivated by *another's provocation*.[3]

The trial court did not err in refusing to instruct the jury on Appellant's proffered instruction of second-degree assault based on sudden passion because it was neither a "nested" lesser-included offense of first-degree assault nor supported by the evidence presented at trial. Based on the foregoing, Point I is denied.

<u>Admission of Evidence - Points II, III, V, VI, and VII</u>

"Determination of the relevancy and admissibility of evidence is a matter clearly within the discretion of the trial court and will not be reversed in the absence of an abuse of that discretion." <u>State v. Kidd</u>, 990 S.W.2d 175, 178 (Mo. App. W.D. 1999). The trial court abuses its discretion when its ruling is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration. <u>State v. Forrest</u>, 183 S.W.3d 218, 223 (Mo. banc 2006). We will reverse only when the error was so prejudicial that it deprived the defendant of a fair trial, meaning that there is a reasonable probability that the result of the trial would have been different had the evidence not been admitted. <u>Id.</u> at 223-24.

To be admissible, evidence must be logically and legally relevant. <u>State v. Anderson</u>, 306 S.W.3d 529, 538 (Mo. banc 2010). "Evidence is logically relevant if it tends to make the existence of a material fact more or less probable." <u>Id.</u> Evidence is legally relevant when its probative value outweighs any prejudice. <u>Id.</u>

---

[3] The parties agree there is no evidence in the record, and no argument being made, that Appellant ingested the drugs involuntarily.

In his third point, Appellant argues the trial court abused its discretion in overruling his objection to Officer Kenyon's testimony about his prior military service because this ruling violated Appellant's due process right to a fair trial, in that probative value of the evidence was outweighed by its prejudicial impact since it merely served to improperly bolster Kenyon's character and had no other relevance.

In his second point, Appellant contends the trial court abused its discretion sustaining the State's objection to the admission of evidence regarding Officer Kenyon's alleged prior misconduct and use of force because it denied Appellant his due process rights to a fair trial and to present a defense, in that the State had presented evidence of Kenyon's good character when it emphasized his military career, and evidence that Kenyon had used excessive force when off duty would have been a fair response to that evidence and would have impeached Kenyon's credibility with regard to his version of the events of the alleged assault.

Kenyon briefly testified at trial as to his occupational experience, stating he had been on active duty in the military for 8 years, attaining the rank of sergeant; was currently in the Army Reserves; and had worked for the St. Charles County Department of Corrections for 5 years before joining the City of O'Fallon police force 13 years earlier.

"'Questions to a witness directed toward aiding the jury in setting a proper estimate on his testimony are preliminary in their nature and may be properly asked, as, for example, questions which relate to the age of the witness, his residence, his occupation, and his condition in life, etc. It is common practice.'" State v. Brayfield,

540 S.W.2d 233, 235 (Mo. App. Spr.D. 1976), quoting State v. Foster, 355 Mo. 577, 197 S.W.2d 313, 326 (Mo. 1946). Character evidence is "that [which] concerns a person's reputation, such as whether someone in the defendant's community views the defendant as a law-abiding citizen, a peaceable person, a truthful person, or as having any other general character trait." State v. Shockley, 410 S.W.3d 179, 193 (Mo. banc 2013).

Evidence of a witness's occupational background is not character evidence. Appellant has failed to elucidate how the bare fact that Kenyon served in the military amounts to improper character evidence, failing to provide any citation or analysis supporting such a finding. The trial court did not abuse its discretion in permitting Kenyon to briefly outline his occupational background and experience. Even if the admission of this evidence could be said to be improper, in light of the overwhelming evidence of Appellant's guilt, the admission of this evidence was not so prejudicial that it deprived Appellant of a fair trial.

Later at trial, the defense sought to present the testimony of Matthew Bishop and his father, Steven Bishop, to testify about a "prior incident, prior allegation, of excessive force" made against Kenyon while he was off duty. The trial court ruled the testimony inadmissible. As an offer of proof, Matthew Bishop, aged 26, testified that when he was 15 years old, he cut through a yard with his younger brother and a friend on the way to a video store. Matthew testified that Kenyon, who appeared to be drinking, and another man ran after the boys and slammed him to the ground. Matthew was arrested and later released to his father, Steven Bishop. Matthew suffered a concussion and injured his hip. The parties agreed the Bishops would drop their complaint against Kenyon and criminal

11

charges against Matthew would also be dropped.  On appeal, Appellant contends this evidence went to Kenyon's credibility regarding the struggle between him and Appellant.

The trial court did not abuse its discretion in granting the State's objection to the Bishops' testimony at trial because the evidence did not negatively reflect upon Kenyon's credibility.

> The most commonly recognized methods of impeaching a witness include: [1] admission of evidence showing the witness's incapacity or problems in his or her ability to perceive or memory; [2] admission of evidence of prior convictions; [3] admission of evidence of the witness's bias, interest or prejudice; [4] admission of prior inconsistent statements of the witness; and [5] admission of evidence of the witness's character for truthfulness and veracity.

Mitchell v. Kardesch, 313 S.W.3d 667, 675 (Mo. banc 2010).

Here, the alleged incident between Kenyon and Matthew Bishop 11 years earlier had no bearing on the events in this case and was not proper impeachment testimony. The proffered evidence did not tend to show Kenyon lacked the ability to perceive the events that transpired during Appellant's attack, and was not evidence of a prior conviction; of Kenyon's bias, interest, or prejudice; of a prior inconsistent statement; or of Kenyon's truthfulness and veracity.

Furthermore, it cannot be said that this evidence was a "fair response" to evidence presented by the State regarding Kenyon's military career because the limited evidence presented regarding Kenyon's occupational background was not character evidence. Based on the foregoing, Appellant's Points II and III are denied.

### Point V

In his fifth point, Appellant argues the trial court erred in overruling his objection to the testimony regarding State's Exhibit 154, a rap video, during the guilt phase of

12

Appellant's trial because this ruling violated his rights to due process and to be tried only for the crime with which he was charged, in that it was improper character evidence that had no probative value but had a prejudicial impact.

Detective Brian Buchanan, who interviewed Appellant, testified Appellant volunteered that he had taken LSD, that he "kind of…blacked out" and "there was a force, like trying to kill [him]." Appellant stated he saw demons and "turned into a dragon" who was "biting heads off and breathing fire." Appellant claimed he could not remember what he had done and asked if anyone had been hurt. Buchanan testified he reviewed a YouTube video of Appellant performing a "freestyle rap" containing statements "strikingly similar" to Appellant's statements to police at the hospital, referencing demons and being a dragon and breathing fire.

During trial, the defense objected to the admission of Buchanan's testimony regarding the rap video, asserting it was irrelevant and highly prejudicial. The State asserted the evidence was relevant to show Appellant's motivation, intent, and knowledge of the crime because Appellant previously talked about these things before trying to use them as a defense to the charges. The trial court overruled Appellant's objection to the testimony.

The trial court did not abuse its discretion in admitting Detective Buchanan's limited testimony regarding Appellant's statements in the rap video. This evidence was relevant to Appellant's consciousness of guilt, in that the similarities between the video and Appellant's police statements could support a finding that Appellant fabricated aspects of the incident to the police in order to appear less culpable. Furthermore, in light of the overwhelming evidence against Appellant, it cannot be said that this limited

13

testimony was so prejudicial that it deprived Appellant of a fair trial.  Appellant's Point V is denied.

## Point VI

Approximately an hour after the incident, police located Daniel and took a photograph of his injuries.  This photograph, State's Exhibit 148, was admitted into evidence at trial over Appellant's objection.  Appellant maintains the trial court erred in admitting the photograph into evidence because it violated his right to be tried only for the crime with which he was charged, and any probative value of the photograph was outweighed by its prejudicial impact.

Generally, evidence of uncharged crimes is inadmissible unless it has a legitimate tendency to establish the defendant's guilt of the crime charged and is not merely used to show the defendant's bad character or predisposition to commit the crime.  State v. Henderson, 826 S.W.2d 371, 374 (Mo. App. E.D. 1992).  Evidence of uncharged crimes that are part of the circumstances or sequence of events surrounding the charged offense is admissible to present a complete and coherent picture of the events that transpired.  State v. Harris, 870 S.W.2d 798, 810 (Mo. banc 1994).  Although Appellant was not charged with any offense for his attack on Daniel, the attack was part of the circumstances or sequence of events surrounding the charged offenses, and the photo of Daniel's injuries was admissible to present a complete and coherent picture of the evening's events.  The trial court did not abuse its discretion in overruling Appellant's objection to this evidence.  Appellant's Point VI is denied.

<u>Point VII</u>

In his seventh point, Appellant argues the trial court abused its discretion in overruling his objection to State's Exhibit 152, a thank-you card Naber sent to Officer Kenyon, because any probative value of the evidence was outweighed by its prejudicial impact.

At the conclusion of her testimony on direct examination, Naber testified, without objection, that she had sent Kenyon a card. At trial, Kenyon confirmed he received a card from Naber. Over Appellant's objection, Kenyon identified the card in which Naber thanked Kenyon for doing his job and saving her life.

Contrary to Appellant's assertions, the card was relevant because it tended to corroborate the evidence that Naber had been attacked by Appellant, the attack was ongoing when Kenyon arrived at the scene, and Kenyon had intervened. The trial court did not abuse its discretion in allowing the State to present evidence that Naber sent Officer Kenyon the card following the incident. Appellant's Point VII is denied.

<u>Point IV – Newly Discovered Evidence</u>

In his fourth point, Appellant maintains the trial court abused its discretion in overruling his motion for new trial based on newly discovered evidence because the ruling violated his due process right to present a defense, in that Appellant presented evidence at the hearing on the motion that (1) called into doubt Appellant's guilt of the assault of Officer Kenyon, (2) the evidence came to defense counsel's knowledge after the end of the trial, and was not a result of a lack of due diligence, and (3) the witness would have testified at trial to a version of events that would have called Officer Kenyon's story into question.

15

Rule 29.11(a)[4] provides the trial court may grant a new trial "upon good cause shown." "New trials based on newly discovered evidence are disfavored, and the trial court has substantial discretion in deciding whether a new trial should be granted." State v. Stewart, 313 S.W.3d 661, 665 (Mo. banc 2010). Absent an abuse of that discretion, the trial court's decision will be affirmed on appeal. Id.

> To obtain a new trial on the basis of newly discovered evidence, [the defendant is] required to show: (1) the facts constituting the newly discovered evidence came to his knowledge after the trial; (2) his lack of prior knowledge was not owing to want of due diligence on his part; (3) the newly discovered evidence is so material that it is likely to produce a different result at a new trial; and (4) the evidence is not merely cumulative evidence or evidence impeaching a witness's credibility.

Id. Evidence is considered to likely produce a different result at a new trial if it is credible and reasonably sufficient to raise a substantial doubt in the mind of a reasonable person as to the result of a new trial. Id.

Appellant filed a motion for new trial alleging the discovery of new evidence. Appellant attached the written statement that Joshua Avery (Avery), a witness to the incident, gave to investigators on the day of the attack. In this statement, Avery indicated he saw the police officer on his back on the ground, and Appellant was "on top of" the officer and would not stop hitting him. Appellant also attached a letter purportedly written by Avery two months after the trial to Appellant's mother asserting Appellant had not been on Kenyon's back choking him. The letter indicates Avery saw the entire encounter and that Appellant had been fighting the officer, Appellant "went down with the officer" when the officer slipped, Appellant was punching the officer, and Appellant tried to run away after the officer "got [Appellant] off of him." The letter states Avery did not want to give a statement to the police on the night of the incident but the police

---

[4] All rule references are to Mo. R. Crim. P. 2013.

16

had found marijuana on Avery and coerced him into giving a statement by threatening to charge him with a crime. At the hearing on the motion, defense counsel indicated she had attempted to locate Avery prior to trial but had been unsuccessful due to Avery's incarceration.

At the hearing, the State presented the testimony of Detective Dean Frye (Frye), who testified he spoke with Avery at the scene. Frye testified he did not search Avery, let alone find any marijuana on him, and did not threaten Avery in order to get his statement. The State also questioned the authenticity of the letter and argued that Avery's credibility was weak because of several prior criminal convictions.

The trial court found this evidence came to Appellant's knowledge after the end of trial and the lack of knowledge was not the result of a lack of due diligence by the defense. The court, however, denied the motion, finding the evidence was not so material and credible that it was likely to produce a different result at a new trial.

The trial court did not err in denying Appellant's motion. First, the authenticity of the letter was questionable as there was nothing presented verifying it was written by Avery. Second, assuming *arguendo* that the letter was authentic, Avery's prior convictions and conflicting statements weakened his credibility, particularly in light of Det. Frye's testimony.

Furthermore, this evidence was not so material that it was likely to have produced a different result at a new trial. Avery's descriptions of the events in his statement to police and in the letter are substantially similar. Both statements indicated that when Kenyon had his back to the ground, Appellant was on top of Kenyon repeatedly punching

him. Avery's letter indicates Appellant only ran away after Kenyon "got [Appellant] off of him." These statements corroborate the evidence that was presented at trial.

The only "new" evidence in the letter was Avery's assertion that he never saw Appellant choking Kenyon. While this differs from Kenyon's testimony that Appellant choked him, Avery's statements are similar to that of two other witnesses whose testimony was presented at trial. Because the jury was presented with differing accounts at trial and concluded Appellant was guilty of the charged offense, it is unlikely that Avery's testimony would produce a different result at a new trial or raise a substantial doubt in the mind of a reasonable juror. Appellant's Point IV is denied.

Point VIII

In his eighth point, Appellant argues the trial court abused its discretion in overruling his objection during the prosecutor's closing argument because the argument was designed merely to inflame the passions and prejudices of the jury, in violation of Appellant's rights to due process of law and a fair trial, in that the prosecutor improperly denigrated defense counsel when he argued that she "threw garbage at the police" because Appellant did not have a defense.

During closing argument, the State argued as follows:

> [Prosecutor]: They've also tried to put the O'Fallon Police Department on trial, and that is just horrendous. Oh, you don't tape your fellow officers. You've heard every officer say that is not what we're supposed to do. Just over, and over, and over again. The police officers aren't doing their job. And you know what? As prosecutors, we know when we hear that, the defense doesn't have any other defense, so they've got to blow a bunch of smoke at the police.
> [Defense Counsel]: Objection as to what the prosecutor believes.
> THE COURT: Overruled.
> [Prosecutor]: And that's the oldest trick in the book. You don't have defense? Throw a bunch of garbage at somebody else. Make them look bad. Say they didn't do their job. Say they weren't doing what they were supposed to.

18

What we do know, ladies and gentlemen, more than anything, who was the one person who was doing wrong that evening? You know, the defense in her opening said a lot of bad things happened.

The trial court has broad discretion in controlling the scope of closing arguments. Forrest, 183 S.W.3d at 226. The defendant has the burden to prove he was prejudiced by the improper argument, and prejudice is present only if the complained-of comment had a decisive effect on the jury's decision. State v. Steele, 314 S.W.3d 845, 851 (Mo. App. W.D. 2010).

Contrary to Appellant's assertion on appeal, he did not object to the prosecutor's statement at trial, failing to preserve it for review. This Court reviews unpreserved error for plain error only. Under plain error review, this Court will reverse the trial court only when the court committed an evident, obvious, and clear error that affected a substantial right, resulting in a manifest injustice or a miscarriage of justice. Rule 30.20; State v. Washington, 260 S.W.3d 875, 879 (Mo. App. E.D. 2008).

Personal attacks on opposing counsel are improper and objectionable. Steele, 314 S.W.3d at 852. "However, if the statement is characterized as an attack on the defense's technique or trial tactics, rather than counsel's integrity or character, the argument is permissible." Id. (internal quotations omitted).

Here, the prosecutor's remarks were an attack on defense counsel's technique and trial tactics and cannot be said to be a personal attack on counsel. The trial court did not err in failing to *sua sponte* strike the prosecutor's closing remarks. Appellant's Point VIII is denied.

Points IX and X - Sentencing

In his ninth point, Appellant argues the trial court plainly erred in sentencing him to consecutive sentences of 10 years for assault in the first degree and 15 years for assault of a law enforcement officer in the first degree because in so doing, the court violated the provisions of Section 557.036 and Appellant's right to due process of law, in that the prosecutor told the jury the judge would "most likely" run any sentences concurrently. Appellant argues once the jury had been told the judge would likely run the sentences concurrently, the court was bound by the jury's highest sentence recommendation of 15 years.

In his tenth point, Appellant argues the trial court plainly erred in failing to *sua sponte* instruct the jury during the prosecutor's closing argument during the penalty phase that the jury was not to consider whether Appellant's sentences would run concurrently or consecutively. Appellant contends this failure of the court allowed the prosecutor to improperly inject into the minds of the jurors an issue not proper for their consideration, in violation of Appellant's right to due process of law, in that the prosecutor altered the jury's sense of responsibility for the sentences they were to assess.

Appellant concedes he did not preserve these issues for review and that they may be reviewed for plain error only.

Under plain error review, the defendant must show that an evident, obvious, and clear error affected a substantial right resulting in manifest injustice or a miscarriage of justice. Rule 30.20; Washington, 260 S.W.3d at 879. It is the defendant's burden to demonstrate that the error prejudiced him and resulted in manifest injustice or a miscarriage of justice. State v. Johnson, 220 S.W.3d 377, 385 (Mo. App. E.D. 2007).

20

During opening arguments at the penalty phase, the parties argued, in pertinent part, as follows:

> [Prosecutor]: I'm sure [defense counsel] will be asking for the minimum. But I'm going to be asking from you, ladies and gentlemen, is for 20 years on each of the three counts. It will be the Court's decision at a later date whether they're to be concurrent or consecutive. That's not your decision, ladies and gentlemen. That will be the Court's decision. I truly believe 20 years, which if the Court ends up running those concurrent, that would be a very fair sentence. The minimum on the first and third is 10 years apiece. The minimum on Count 2 is three years. That can technically go up to I guess technically 99 years, but I'm certainly not going to be asking for that. I'm not going to be asking for the maximum.
> …
> [Defense Counsel]: [T]his is also a very important phase in terms of deciding what the sentence for [Appellant] is going to be. 20 years consecutive is 60 years. It was said in voir dire 10 years is a long time. We're talking about events that transpired over about – less than 20 minutes of [Appellant's] life…. 10 years is a long time. And that's what we're asking for is the minimum on each count. Ultimately, that's a possibility of 23 years if the judge decides to run them consecutively. But we're asking for the minimum on each count. Thank you.

After the presentation of evidence, the parties argued during their closing statements as follows:

> [Prosecutor]: I'm going to be real short and sweet, ladies and gentlemen. 20 years on each count…I implore you, 20 years on each count, ladies and gentlemen. But ultimately, it is your decision. If you decide to go higher or lower, we respect your decision. Thank you.
> [Defense Counsel]: …The difference between 10 years and 60 years is huge. It's a difference between being 83 and being 33. Having a chance to go further with life again.
> …
> [Prosecutor]: …Ladies and gentlemen, concurrent, consecutive; That's up to the judge. What you give, that will be later determined if that's concurrent or consecutive. Most likely concurrent. I can't say for sure what the judge will do.

The jury recommended sentences of 10 years for assault in the first degree, 5 years for armed criminal action, and 15 years for assault of a law enforcement officer in the first degree. The court sentenced Appellant pursuant to the jury's recommendation to

21

concurrent prison terms of 10 years for assault and 5 years for armed criminal action, both to run consecutively to a term of 15 years for assault of a law enforcement officer, for a total of 25 years' imprisonment.

On appeal, Appellant contends the trial court could not sentence him to more than 15 years in prison because the jury was misled as to the result of their sentencing assessment because the prosecutor told them the trial court was probably going to run the sentencing concurrently.[5] Appellant's point is without merit.

The prosecutor *repeatedly* advised the jury that it was the trial court's decision whether the sentences would run concurrently or consecutively and that he did not know what the court would do. While ignored by Appellant on appeal, a full review of the record demonstrates that *defense counsel repeatedly* requested the jury to consider the trial court's discretion regarding concurrent or consecutive sentencing in issuing its recommendation. The trial court did not err in sentencing Appellant to a combined term of 25 years' imprisonment.

Appellant's tenth point, that the trial court erred in failing to *sua sponte* instruct the jury not to consider whether Appellant's sentence would run concurrently or consecutively because this failing allowed the prosecutor's argument to alter "the jury's sense of responsibility for the sentences they were to assess," is equally without merit. Both sides argued to the jury the sentences they deemed appropriate and at no time suggested to the jury that it was not their responsibility to assess punishment.

---

[5] In support of the proposition that the total number of years Appellant could be sentenced to was "capped" at the lengthiest individual sentence imposed by the jury, Appellant cites to Section 577.036.5 which states, "If the jury returns a verdict of guilty in the first stage and declares a term of imprisonment in the second stage, the court shall proceed as provided in subsection 1 of this section except that any term of imprisonment imposed cannot exceed the term declared by the jury unless the term declared by the jury is less than the authorized lowest term for the offense, in which event the court cannot impose a term of imprisonment greater than the lowest term provided for the offense."

We find the trial court did not err, plainly or otherwise, in entering sentence against Appellant or in failing to *sua sponte* instruct the jury not to consider whether Appellant's sentences would run concurrently or consecutively. Appellant's Points IX and X are denied.

## Conclusion

The judgment of the trial court is affirmed.

_____
Sherri B. Sullivan, P.J.

Patricia L. Cohen, J., and
Kurt S. Odenwald, J., concur.